**Edwin SANDLER and Vivian Sandler, Plaintiffs,**

v.

**NEW YORK NEWS INC., incorrectly sued herein as "Daily News, Inc.," Defendant.**

**No. 88 Civ. 4283 (RWS).**

United States District Court, S.D. New York.

Sept. 11, 1989.

Elliott S. Martin, Brooklyn, N.Y., for plaintiffs.

Seyfarth, Shaw, Fairweather & Geraldson, New York City (John Powers, Bonnie Glatzer, of counsel), for defendant.

SWEET, District Judge.

Defendant New York News Inc. (the "News") moves pursuant to Rule 56, Fed. R.Civ.P., for summary judgment dismissing a complaint filed by its former employee Edwin Sandler ("Sandler"), and his wife, Vivian Sandler.[1] The lawsuit arises out of the News' erroneous overstatement of the amount of monthly pension benefits Sandler was eligible to receive upon retirement, a misrepresentation made to Sandler at the time he was deciding whether to accept the News' offer of a voluntary job termination incentive ("buyout"). Sandler has cross-moved for summary judgment. For the reasons set forth below, News' motion is granted in part and denied in part. Sandler's cross-motion is denied.

---

1. The operative facts in this action involve only Sandler and the News. The opinion therefore refers to Sandler alone in discussing plaintiffs' complaint.

*Prior Proceedings*

Sandler commenced this action in the Supreme Court of New York, County of New York, on or around May 25, 1988, by service of the summons and complaint. The complaint's first claim alleges that Sandler, in electing to accept the News' buyout offer, detrimentally relied upon the negligent representation of the News as to the inflated value of his pension. The second and third claims allege contractual breach of an agreement Sandler asserts was formed or was supplemented when News represented to Sandler the amount of monthly pension he would receive.

On June 20, 1988, the News removed the case to federal court on the ground that plaintiff's claims are governed by the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and thus arise under the laws of the United States for purposes of removal jurisdiction. Sandler made no attempt to have the action remanded to state court.[2]

On or about June 27, 1988, News filed its answer and affirmative defenses. In an amended answer filed around July 15, 1988, News offered as an affirmative defense the failure of Sandler to join the administrator of the News' pension plan as a party defendant. Discovery nevertheless proceeded, by document exchange and by deposition (counsel for News deposing Sandler and plaintiff's counsel deposing a number of employees, or former employees, of News).

On April 5, 1989, News brought its summary judgment motion, supported by deposition testimony, deposition exhibits and

the fact affidavit of Thomas V. Luhn, present manager of compensation and employee benefits for the News. Sandler has cross-moved for summary judgment, relying on, in addition to deposition testimony and exhibits, the affidavit of Alan Solowe, a financial adviser Sandler consulted at the time of the buyout decision. Both parties have submitted statements of material facts not subject to genuine dispute, pursuant to Local Rule 3(g) (the "3(g) Statements").[3] The motion was heard and considered fully submitted on May 19, 1989.

*The Facts*

The following facts are found on the basis of the affidavits, deposition testimony, exhibits and 3(g) Statements. No direct factual controversy has been presented by the parties, although certain conclusions to be drawn from the facts are sharply disputed.

Sandler was hired by the News in 1965 as a mailer. He continued to work as a News' employee for over 20 years, the last 15 of which he served in a supervisory capacity as a mailer foreman. In late December 1986, he received, considered, and accepted an employment buyout offer from the News, resulting in his voluntary termination from the News effective January 15, 1987.

The buyout was offered to selected mailer foremen employed at the News following the News' decision to subcontract its insert operation to another company. The offer was orally conveyed to Sandler on December 26, 1986 by the News' pension

---

**2.** A civil action may be removed to a district court if the court has "original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States." 28 U.S.C. § 1441(b). Although Sandler did not oppose removal of this action, the fact that his "well-pleaded complaint" raises only state law claims requires this court to consider *sua sponte* whether it possesses the requisite jurisdiction to support removal. The court finds it does.

In its recent decision, *Metropolitan Life Insurance Company v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), the Supreme Court held that a validly pleaded defense of ERISA preemption confers subject matter and removal jurisdiction, notwithstanding the ordinary rule

of *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908) (federal question must appear on face of "well-pleaded complaint"). Defendant News has pleaded ERISA preemption as a defense to the complaint. In view of the court's determination, *infra,* that the ERISA preemption defense is valid with respect to certain of Sandler's claims, jurisdiction is present over this entire action. *See* 28 U.S.C. 1441(c); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**3.** However, neither the News or Sandler has submitted a statement under Rule 3(g) of facts as to which it contends there exists a genuine issue to be tried.

manager, Philip J. Canfield ("Canfield"), who had been charged by the News with the task of shepherding offerees through the buyout procedure. The terms of the offer required Sandler to relinquish employment permanently at the News in exchange for a payment of $50,000, an additional sum equal to three months pay, and two years' continuation of medical and life insurance benefits. Sandler was given one week to decide whether to accept or decline this offer.

The following day (or perhaps on December 28), while contemplating the buyout offer, Sandler telephoned Canfield to discuss what pension benefits he would receive if he accepted the buyout. Canfield, in addition to serving as the News' pension manager, was one of three members of the pension committee charged with administering the Salaried Foremen's Pension Plan ("Plan") in which Sandler was a participant. Canfield advised Sandler during the course of the phone call that his retirement benefits under the Plan, were he to accept early retirement in connection with the buyout, would amount "in rough figures" to $1049 per month.[4]

At the time of this phone call, Sandler was sitting at home with a financial adviser whom he had consulted to assist him in making a decision about the buyout offer. Following receipt of the information from Canfield as to the amount of his monthly pension and after consultation with the financial adviser, Sandler decided to accept the buyout offer and to apply for early retirement under the Plan. Sandler proceeded to sign the buyout agreement, terminated his employment with the News effective January 15, 1987, and received from the News the lump sum payment he was entitled to under the terms of the buyout. Sandler also applied for early retirement, with pension benefits to commence as of February 1, 1987.

When Sandler actually began receiving his monthly pension checks in the ensuing months, they were for $774.49 each month, almost $275 per month less than the $1049.00 amount he and his wife had anticipated receiving based upon the conversation with Canfield. Sandler promptly requested that the Pension Committee review his benefit amount in view of the quite different figure he had been given by Canfield at the time he made his decision to accept the buyout and elect early retirement. The Pension Committee concluded after review that $774.49 was the correct monthly payment owed to Sandler pursuant to the Plan, a conclusion that also was reached by the Department of Labor following Sandler's filing of a complaint with that agency. Sandler does not now dispute that under the terms of the Plan the monthly pension amount owed him is $774.49, rather than the sum of $1049 represented to him by Canfield in December 1987, when he was making his decision whether to terminate his employment with the News.

The erroneous $1049.00 figure communicated by Canfield to Sandler resulted from Canfield's improper use of a 35 year service record in calculating the level of benefits that would be provided to Sandler under the Plan. Had Canfield performed the correct calculation, he would have used Sandler's actual, and considerably shorter, service period at the News to figure Sandler's benefits. As Canfield frankly stated subsequently, in a letter to the Department of Labor, the consequence of his "hurry up, unaudited estimate" was "a significant overstatement of [Sandler's] News Pension." Just how significant an overstatement it was is indicated by the fact that,

---

**4.** The stated monthly payment was for the Plan's "ten year certain option." The Plan contained a number of payment options from which a participant could choose. The "ten year certain option" limits payments to the lifetime of the retiree, but in the event of his death prior to collection of 120 monthly payments, the designated beneficiary is entitled to receive the remainder of those payments. Another option, the "50% surviving spouse option," pays a somewhat reduced benefit during the retiree's lifetime with a lifetime annuity to the surviving beneficiary equal to one-half of the retiree's benefit. Sandler claims to have chosen the former option, while the News' records reflect selection of the latter. That dispute is immaterial because Sandler's lawsuit does not seek any relief in connection with the relatively minor difference (of approximately $30) in monthly payments between the two options.

had Sandler decided to stay at the News until (or even beyond) the standard retirement age of 65 instead of accepting the buyout offered to him at age 60, the maximum length of service he could have attained for benefit purposes under the Plan rules was 26 years—nine full years of labor (or 26%) less than the service period Canfield in fact used in performing his careless calculation.

The pension Sandler now receives, by virtue of his decision to take early retirement effective February 1, 1987, had a present value of $95,547.00 as of that date. Had Sandler chosen to reject the buyout and been permitted to continue working at the News, he could have earned an additional four years of credited service under the Plan, entitling him to retire, effective July 1, 1991, with a pension worth $146,936.00 on a present value basis. The difference amounts to slightly more than $50,000.[5] The pension Sandler believed he would receive following his early retirement based upon Canfield's representation, but to which he could never have become entitled under the Plan, would have a value substantially in excess of these pension figures.

Other economic consequences flowed from Sandler's decision to accept the buyout and take early retirement. He immediately received $62,558 in cash as a condition of the buyout agreement. He also stopped receiving his salary from the News, then amounting to about $50,000 annually, and agreed not to continue, or seek any further, employment with the News. Whether continued employment would have been available with the News had Sandler rejected the buyout offer, and at what position and salary level, is not readily discernible on this record.

Since his retirement from the News, Sandler has found employment at the New York Times. He works one or two days a week at overtime rates as a substitute mailer for that newspaper. Although his acceptance of the News' buyout offer has resulted in his being placed far down the list of applicants seeking mailer work at the New York Times, Sandler works just about half of the overtime hours offered to him by that paper. For the first eleven months of last year, he earned about $12,000 from this work. As a result of this occasional employment, Sandler's future, age 65 pension benefit from a separate, national multiemployer pension fund continues to grow roughly in proportion to the number of shifts he works.

*Preemption Under ERISA*

Having removed the Sandlers' action to federal court on the ground that ERISA governs their state law claims, News now has moved for summary judgment dismissing those claims. The principal reason News advances for dismissal is that ERISA wholly preempts the state law theories on which Sandler relies. News cites for support § 514(a) of ERISA, which provides, in pertinent part, that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employment benefit plan" that is governed by ERISA. 29 U.S.C. § 1144(a).

As discussed below, ERISA does indeed preempt Sandler's second and third claims, which seek to recover pension benefits under a common law contract theory. Sandlers' first claim, however, requires a different result. Preemption of that cause of action, which seeks compensatory damages for loss of employment alleged to arise from the employee's detrimental reliance on his employer's negligent pension representations, is neither required by ERISA's

5. The second pension figure, supplied by News' affiant Thomas V. Luhn, assumes, among other things, that Sandler's salary would have increased by five percent a year between 1988 and 1991, causing a corresponding increase in the average annual salary employed in computing subsequent pension payments. Although the nominal difference between that figure and the pension Sandler now receives is around $50,000, in fact the $146,936 pension cannot be so readily compared to Sandler's actual $95,547 pension since the former figure apparently is a present value computation as of July 1, 1991 and the latter a present value computation as of February 1, 1987. It would be a simple matter to determine the future value of Sandler's $95,547 pension on July 1, 1991 were the interest rate employed in Mr. Luhn's pension calculations set forth in his affidavit. Unfortunately, it is not.

§ 514(a) nor warranted under the factual circumstances presented here.

### A. *ERISA Preemption Standards*

The scope of preemption under ERISA was not long ago addressed by the Supreme Court, *see Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Insurance Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and even more recently received careful delineation by the Court of Appeals in *Aetna Life Insurance Co. v. Borges,* 869 F.2d 142 (2d Cir.1989). More than once the Supreme Court has instructed that § 514(a)'s preemption of state laws that "relate to" employee benefit plans is to be interpreted expansively, in view of the Congressional aim to " 'establish pension plan regulation as exclusively a federal concern.' " *Dedeaux,* 481 U.S. at 46, 107 S.Ct. at 1552 (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). So construed, ERISA has been held to preempt more than just those state laws that, by specific design, affect or address employee benefit plans or concern the specific subject matters covered by ERISA. *Borges,* 869 F.2d at 144 (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983).

It is equally apparent that Congress did not "mean[ ] to preempt all laws having any impact on such plans, no matter how small or how tangential." *Borges,* 869 F.2d at 145. Numerous state laws of general application indirectly affect the cost and administration of pension plans. Not all (or even most) of such laws could have been comprehended to be without further application under ERISA's Section 514(a), insofar as they cause only "tenuous, remote, or peripheral" effects on plan administration or expense. *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. Thus, many state laws that indirectly bear on the administration of employee benefit plans have not been subjected to ERISA preemption, owing to the "common sense" understanding that a preemption provision "designed to prevent state interference with federal control of ERISA plans does not require the creation of a fully insulated legal world that excludes these plans from regulation of any purely local transaction." *Rebaldo v. Cuomo,* 749 F.2d 133, 138 (2d Cir.1984), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

The difficult task is to discern an intelligible line that divides those state laws that "relate to" benefit plans within the meaning of § 514(a) and those that affect such plans in too "tenuous, remote, or peripheral" a manner to warrant such a finding. With that aim in mind the Second Circuit in *Borges* reviewed the decisional law. The Court concluded that the types of state laws that have been deemed preempted are

> those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.

*Borges,* 869 F.2d at 146.

In assessing whether a law's effects are incidental, *Borges* teaches that economic impact alone does not require invalidation of a state law nor does the fact that such a law has indirect effects on pension plans necessitating minor local adjustments in benefit administration. Rather, preemption is triggered where a state law affects "primary administrative functions of benefit plans." *Id.* Examples are laws that substantively alter a plan's terms of eligibility or the amount of benefits to be paid to a participant pursuant to a plan. *See, e.g., Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 524, 101 S.Ct. 1895, 1906–07, 68 L.Ed.2d 402 (1981) (state law prohibiting one method of calculating plan benefits); *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 327 (2d Cir.1985) (state severance pay law dictating determination of whether benefits are paid under plan), *aff'd,* 477

U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986).

### B. *Preemption of Breach of Contract Claims*

■ Applying these standards to this case, Sandler's breach of contract claims "relate to" News' pension plan within the meaning of § 514(a). Although the common law of contracts is not the sort of state law that suffers preemption because it directly refers, or solely applies, to the field of employee benefit plans, *see Borges*, 869 F.2d at 146, Sandler's contract claims do nevertheless seek to increase the amount of monthly pension benefits payable to him, by alleging that the amount of benefits owed to him under the Plan was contractually altered by Canfield's representation. The contract theory relied upon by the plaintiff thus "provide[s] an alternative cause of action to employees *to collect benefits protected by ERISA*," *id.* (emphasis supplied), and so falls rather squarely into one of the classes of state laws or actions that *Borges* recognizes as preempted by ERISA's § 514(a). *See also Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987) (common law contract claim for recovery of benefits preempted by ERISA); *Gilbert*, 765 F.2d at 328 (citing numerous decisions finding claims for relief under the common law of contracts preempted); *Schwartz v. Newsweek, Inc.*, 653 F.Supp. 384, 389 (S.D.N.Y.1986) (same), *aff'd*, 827 F.2d 879 (2d Cir.1987). Claims two and three of the Sandler complaint are for that reason dismissed.

### C. *Preemption of Negligent Misrepresentation Claim*

■ The court reaches a contrary conclusion with respect to Sandler's first claim, which alleges Sandler gave up his position at the News in reliance upon erroneous financial misrepresentations News made at the time Sandler was contemplating whether to accept its voluntary termination offer. Unlike the common law contract claims discussed above, this cause of action only remotely relates to ERISA because its resolution will neither "determine whether any benefits are paid" nor "directly affect the administration of benefits under the plan." *Gilbert*, 765 F.2d at 327.

Sandler's detrimental reliance claim is not equivalent to an action for benefits improperly denied him under the News Plan in which he was a participant. Indeed, he concedes that he presently receives the amount of pension owed him pursuant to the Plan rules. Plaintiff proceeds on quite a different theory. He sues not as a participant, seeking recovery of benefits from the Plan, but as an employee seeking economic damages from his employer alleged to arise from his relinquishment of his position at the paper. The predicate for those damages is not wrongful benefit denial, but rather the allegation that plaintiff detrimentally relied on false financial information negligently communicated to him by his employer, while he was engaged in the process of deciding whether to accept his employer's pending termination offer. Consistent with this theory, Sandler's suit is brought against his employer, the News, as distinguished from the individuals who compose the Plan's administrative board.

The legal foundation of this action is for these reasons quite unlike the many common law tort and contract actions, typically brought against plan administrators or plan insurers, that are held preempted because they seek recovery based upon improper denial of benefits under a plan or policy.[6] The leading Supreme Court deci-

---

**6.** The cases cited by defendants, not one of which was decided by a court within this circuit, primarily hold to this pattern. *See, e.g., Daniel v. Eaton*, 839 F.2d 263 (6th Cir.1988) (action seeking reinstatement under plan and recovery of past due benefits), *cert. denied*, — U.S. —, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *Belasco v. W.K.P. Wilson & Sons, Inc.*, 833 F.2d 277, 281 (11th Cir.1987) (claim for medical benefits and damages for wrongful denial of benefits); *Light v. Blue Cross and Blue Shield of Alabama Inc.*, 790 F.2d 1247, 1249 (5th Cir.1986) (claims arising from alleged wrongful denial of plan benefits); *Blakeman v. Mead Containers*, 779 F.2d 1146, 1151 (6th Cir.1985) (contract claims for recovery of welfare benefits pursuant to plan). To the extent certain others do not, *e.g., Ellenburg v. Brockway, Inc.*, 763 F.2d 1091,

sions, *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), and *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), exemplify the pattern of preemption evident in these cases.

The former case concerned a plaintiff who sought compensatory and punitive damages from an insurer for its alleged bad faith in failing to provide disability benefits pursuant to his employer's group policy. *Dedeaux*, 481 U.S. at 43, 107 S.Ct. at 1551. Unlike Sandler's cause of action, the claims pursued by the plaintiff and held pre-empted by the Court were targeted at plan fiduciaries and were "based on alleged improper processing of a claim for benefits under an employee benefit plan." *Id.*, 481 U.S. at 49, 107 S.Ct. at 1554. The plaintiff in *Taylor* likewise sought damages for denial of plan benefits, as well as reimplementation of coverage. The Court characterized that action as "a suit by a beneficiary to recover benefits from a covered plan." *Taylor*, 481 U.S. at 61, 62–63, 107 S.Ct. at 1545, 1546.

Alternative state law-based suits such as these, brought to "recover benefits from a covered plan," *id.*, are preempted precisely because they directly concern the primary administrative function of benefit plans— the provision of benefits. In contrast, the detrimental reliance theory advanced by Sandler does not "provide an alternative cause of action to employees to collect benefits protected by ERISA." *Borges*, 869 F.2d at 146. Because this sort of claim bears a much more tangential relation to the primary concerns of ERISA, ERISA does not preempt it.

In this conclusion, the court does not stand alone. ERISA preemption defenses have been denied in several cases, each decided after *Dedeaux* and *Taylor*, in which the common law claims in question, although not wholly unrelated to pension plans, did not allege denial of benefits nor attempt to use state law to recover funds

from plan assets. *See McNamee v. Bethlehem Steel Corp.*, 692 F.Supp. 1477 (E.D.N.Y.1988); *Totton v. New York Life Insurance Co.*, 685 F.Supp. 27, 29 (D.Conn.1988) (opinion on rehearing); *Isaacs v. Group Health, Inc.*, 668 F.Supp. 306 (S.D.N.Y. 1987); *Williams v. Cypert*, 708 F.Supp. 229 (W.D.Ark.1989); *Rody v. Midland Enterprises, Inc.*, 685 F.Supp. 129 (M.D.La.1988); *Greenblatt v. Budd Co.*, 666 F.Supp. 735 (E.D.Pa.1987); *Morningstar v. Meijer, Inc.*, 662 F.Supp. 555 (E.D.Mich.1987).

*McNamee* and *Greenblatt* are particularly apposite. In both cases, an employee sued his employer for damages alleged to arise from the employee's reliance on misrepresentations made by the employer that concerned pension benefits. In neither case did the plaintiff's misrepresentation claim charge the defendant with having failed to pay benefits to which the plaintiff was entitled pursuant to a plan. Preemption under such circumstances was inappropriate, the *Greenblatt* court explained, because

> the premise underlying this action was that plaintiff was deceived by the verbal statements made and the actions taken by his employer. That the subject of deception concerned pension benefits is only incidental and not essential to the plaintiff's cause of action. Like promises for a raise in salary, a promotion, or the use of tickets to a baseball game, plaintiff's employer's promise to provide the plaintiff with certain benefits ..., upon which plaintiff could reasonably rely, is the essence of the fraud alleged.

*Greenblatt*, 666 F.Supp. at 742 (*cited with approval in McNamee*, 692 F.Supp. at 1480).

Like the claims in the above cases, Sandler's first cause of action relates too peripherally to ERISA to require its preemption. The gravamen of this claim is that plaintiff would not have elected to relinquish his job and accept his employer's buyout offer had his employer provided him with accurate, rather than erroneous,

---

1095 (9th Cir.1985); *Powell v. Chesapeake & Potomac Telephone Co. of Virginia*, 780 F.2d 419, 422 (4th Cir.1985), *cert. denied*, 476 U.S.

1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986), the court respectfully declines to follow in their steps.

information about the financial consequences of accepting that offer. At base, it is a suit over lost employment. No question of ERISA preemption would arise at all, but for the fact that among the various finance-related communications the plaintiff relied upon in deciding to accept the buyout offer and terminate his employment, the one that was false happened to concern the amount of his accrued pension benefits. Had his employer's error concerned not the pension strand of economic benefits he was to receive on retirement, but one of the financial features contained within the termination package that was not subject to ERISA, defendant could hardly urge dismissal pursuant to ERISA's § 514(a). That the false representation did address pension benefits, rather than the lumpsum payment, seems simply too fortuitous a fact upon which to hinge a preemption determination.[7]

That conclusion is buttressed by the realization that the false representation made to Sandler did not arise within the regular routine of pension administration so much as in connection with his employer's outstanding buyout offer. Canfield, the pension manager, had been charged by the News with shepherding recipients of the voluntary termination offer through the buyout procedure. It was in that capacity as much as pension administrator that San-

dler called upon Canfield (whom one or two days before had personally relayed the terms of the buyout to Sandler) to request pension information bearing directly on his buyout decision. The claim for that reason is properly said to be directed at actions that relate to business concerns of an employer distinct from, and tangential to, ordinary pension plan administration. *Cf. Greenblatt*, 666 F.Supp. at 742 (no preemption where claim was premised upon misrepresentations made to plaintiff in ordinary course of employer's business rather than in course of administering pension plan); *Cypert*, 708 F.Supp. at 231 (plaintiffs permitted to maintain both ERISA and state law claims where defendant acted in dual roles of pension administrator and employer).[8]

In sum, Sandler's state law-based claim of detrimental reliance (*i*) does not seek to recover benefits under a welfare plan (nor damages for the wrongful withholding of benefits rightfully due under a plan); (*ii*) does not proceed against the plan administrators (nor pursue any recovery from plan assets); and (*iii*) is premised upon an employer's misrepresentation that was made outside the routine course of pension administration and could as easily have concerned economic benefits unrelated to ERISA as it did covered benefits. In view of these distinctive factors, the court holds

**7.** Neither counsel for plaintiff or defendant has introduced any evidence suggesting that the News' buyout offer was itself a plan covered by ERISA, although that is a possibility presented by certain decisional law. *See Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320 (2d Cir. 1985) (agreement to pay severance benefits constitutes welfare plan within meaning of ERISA), *aff'd*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986). *Cf. Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (one-time, lump-sum severance payment triggered by termination on occasion of plant closing held not an ERISA plan). Absent any such showing, the court proceeds on the assumption that it was not. Were the buyout in fact an ERISA-covered plan, Sandler's detrimental reliance claim might very well be subject to preemption, since that claim arises directly from his decision to accept the buyout offer.

**8.** The distinction between employer and pension administrator is much emphasized by the News, although for a rather different reason. To sup-

port its argument that the Plan administrator, not News, is the proper party to ERISA-based claims, the News has gone to efforts to disassociate itself from the legal entity responsible for administration of the Plan. Defense counsel thus notes that News is not identified in the Plan documents as the Plan administrator, nor has News been involved in actually administering the Plan. Those allegations might support dismissal of the action against News, were this an action seeking to recover pension plan benefits wrongfully withheld by plan administrators. *See e.g., Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988). That, however, is not the nature of Sandler's claim. Once that is understood, defendant's argument that the law must be sensitive to distinctions between employer and plan seems to add force to plaintiff's contention that its claim for detrimental reliance ought not be preempted by ERISA because it concerns actions of an employer arising outside the context of ordinary plan administration.

that this cause of action bears too attenuated a relation to ERISA to warrant preemption under Section 514(a).

A different conclusion would be required if the record showed that allowing Sandler to pursue his detrimental reliance claim would pose some genuine threat of interference with the administration of primary plan functions. The parties have not identified any such threat, however, and there is reason to believe that claims such as this one, which arise under hopefully unique circumstances only remotely related to central plan functions, will have no more than a "minimal, indirect impact on the administration of benefit plans." *Borges,* 869 F.2d at 146.[9] Accordingly, Sandler's first claim can be maintained as an action against the News founded upon New York's common law of negligent representation.

*Summary Judgment and the Negligent Representation Claim*

A. *The Summary Judgment Standard*

Before considering whether News or Sandler can prevail on their motions for summary adjudication of that cause of action, it is well to review the standard governing that determination. Summary judg-

ment is authorized when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988). All ambiguities are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

Neither party to this action opposes summary judgment on the ground that there exists a genuine issue of material fact. Accordingly, in ruling on the motions the court accepts as undisputed the factual propositions contained in News' and Sandler's respective 3(g) Statements, as qualified by the affidavits, exhibits and deposition testimony contained in the record. Each party nevertheless bears the burden of demonstrating with respect to its own

---

**9.** The court is not blind to the fact that New York's common law of detrimental reliance might have a significant economic and administrative impact on ERISA plans if it routinely were to be made available as a basis for suit by disappointed ERISA participants. Here the preemption holding is premised upon the presence of the special factors outlined above. Among those limiting circumstances are that the claim not seek pension benefits pursuant to a plan (or damages for denial of benefits provided under a plan), that the claim be directed against an employer, rather than plan administrators, and that the claim be founded upon actions that are in some important way disassociated from ordinary plan administration. Such a claim should have no economic impact upon benefit. plan assets, since any actual damages would be predicated upon the employer's, as distinct from pension committee's, actions and so be payable directly by the employer rather than out of plan assets.

Moreover, the level of intrusion on pension-related administrative practices—such as the degree of care taken in performing benefit calculations—that is likely to result from this holding does not warrant preemption. First, any such intrusive effect would be confined to circum-

stances, present here, in which an employer, itself disassociated from plan administration, chooses to pursue independent economic interests and objectives by enlisting its pension administrators to perform tasks in support of and in connection with those distinct economic interests and objectives. Second, even in those limited circumstances, the interference that might arise is of a procedural sort—greater care to benefit calculation; there would be no substantive effect upon a plan participant's "eligibility for a benefit and the amount of that benefit," *Borges,* 869 F.2d at 146–47. Thus, the holding in this case does not threaten the kind of administrative effect that has resulted in preemption in the past. *See e.g., Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 524, 101 S.Ct. 1895, 1906–07, 68 L.Ed.2d 402 (state law that prohibited method of calculating pension benefits permitted under federal law); *Gilbert,* 765 F.2d at 327 (state law that would determine whether or not any benefits are paid).

For these reasons, and mindful of the "deference to [be afforded] to state prerogatives within the federal system," *Borges,* 869 F.2d at 147, the court declines to assume that Congress intended to preempt New York's law of detrimental reliance under the facts presented in this case.

motion that undisputed facts in the record entitle it to judgment as a matter of law. To the extent the record, owing to incompleteness, fails adequately to support either party's motion, summary resolution must be denied notwithstanding the apparent agreement of the parties that the case presents no issue requiring trial.

### B. *Elements of Negligent Misrepresentation Claims*

Under New York law, a recovery may be had for negligent misrepresentation upon demonstrating a defendant's

> carelessness in imparting words upon which others were expected to rely and upon which they did act ... to their damage.... [S]uch information ... [must be] expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all.... [Citations omitted.]

*White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 82 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981) (quoting *White*). *See also International Products Co. v. Erie R.R. Co.*, 244 N.Y. 331, 338, 155 N.E. 662 (1927). News is obliged to negate one or more of these elements to succeed on its motion for summary judgment. Correlatively, Sandler's cross-motion may be granted only if the record shows that each of those elements has been satisfied. Neither party has met its burden.

### C. *News' Motion for Summary Judgment*

■ For purposes of its motion, News does not attempt to negate that it carelessly communicated false information to Sandler, that it owed a duty to Sandler to act with care in furnishing him the information in question, or that Sandler actually relied upon that information.[10] Instead, it argues, first, that reliance on the erroneous information was unreasonable and, second, that Sandler's reliance on it in any event caused him no real detriment.

### (i) News' Knowledge or Expectation that the Information Would Be Acted Upon

News urges that Sandler's reliance on its erroneous representation was unreasonable because "over-the-telephone estimates" are inherently unreliable and because Sandler, had he undertaken efforts to verify the false pension figure provided to him—either by calculating his benefits himself, using a booklet describing the Plan which had been supplied to him years before, or by requesting a written statement of his retirement entitlement as permitted under the Plan—could have discovered the News' error. Those "unreasonable reliance" arguments restate somewhat the legal standard of reliance governing a negligent misrepresentation claim. Under New York law, the more conventional formulation of the inquiry is whether the defendant, News, had reason to know or expect that Sandler would rely upon the information communicated to him in deciding to accept the buyout offer. *See Guarente*, 43 N.Y.2d at 363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (quoted above); *International Products*, 244 N.Y. at 338, 155 N.E. 662 (requiring awareness that person to whom information is given intends to use it for a serious purpose). However, under either legal formula News' position is unjustified on this record.

Had the News made it clear to Sandler at the time the pension figure was orally communicated to him that its pension manager had done no more than perform a "hurry-

---

**10.** News' motion proceeds on the mistaken premise that Sandler's action is one asserting estoppel doctrine in order to force a pension fund to make benefit payments deviating from the terms of the pension plan, when in fact plaintiff has sued his employer, not the pension fund, on the theory that the News' negligent representations induced him to terminate his employment. Thus, authority cited by News for the proposition that courts, out of concern for the actuarial soundness of pension funds, are reluctant to apply estoppel doctrine to require payments from such funds, is inapposite. News' other arguments, discussed below, remain relevant to the negligent representation claim.

up, unaudited estimate," which did not involve checking or even roughly ascertaining the number of years Sandler had been employed by the News, News might now reasonably object that it had no expectation that Sandler would rely upon that information or that such reliance was unreasonable. The record discloses, however, that the only qualification the pensión manager mentioned in the course of responding to Sandler's requests for the amount of his monthly pension under various plan options, was that the numbers he was giving were in "round figures."

The statement that the $1049 pension figure was "rounded," while it might support a deviation measured in cents, or more charitably, even tens of dollars,[11] was insufficient to put Sandler, or an ordinary employee in his position, on notice that his actual monthly pension payment could be some $275 per month less than the figure News provided. It similarly was not a disclaimer explicit enough to justify News' forming a belief that Sandler would not rely upon its pension manager's statement of the amount of pension available to him upon early retirement. In view of the circumstances leading up to Sandler's request for this information, News had every reason to believe the contrary was the case.

The record shows that one or two days prior to Sandler's request for pension information, he had been offered a buyout package by the News in exchange for his agreeing to retire. The offer required his response within a week. The terms of the buyout offer were communicated to Sandler by Canfield, the pension manager, who had been charged by the News with the task of shepherding offerees through the buyout procedure. Thus, when Sandler called Canfield a day or two later to find out what his pension would amount to if he accepted the buyout and elected early retirement, Canfield, and his employer, the News, were on notice that the information they relayed would be used by Sandler for the serious purpose of deciding whether to relinquish his job. In its motion papers, News does not deny that it possessed that knowledge of Sandler's purpose.

Cast in this light, the News' other argument on unjustifiable reliance—that Sandler had access to resources that would have enabled him to detect the News' error, had only he chosen to deploy them—is unpersuasive. Nothing Canfield said or did gave Sandler adequate warning of the need to verify the figures, and pension benefit level calculations are not so readily performed or understood by persons of ordinary ability as to make reliance upon the employer's computations unreasonable.[12]

Accordingly, the court declines defendant's invitation to hold that an employee of ordinary caution, placed in plaintiff's shoes, acts unreasonably in assuming the basic accuracy of financial information communicated to him by his employer. At least when such information is conveyed to an employee, directly and without disclaimer, by a person the employer has entrusted with the responsibility of performing and reporting upon the somewhat complex monetary calculations that underlie such information, and the person so entrusted has reason to know that the information reported will be acted upon by the employee in making an important decision, reliance on the information is not unreasonable nor can it be said to take the employer

11. The sort of "rounding" process the pension manager thought he was employing is a matter of puzzlement, since the figure he gave to Sandler and upon which Sandler allegedly relied—$1049—is rounded, if at all, to the nearest dollar.

12. Defendant's observation that a written calculation of benefits would have been made available to Sandler had he specifically requested one might be persuasive evidence under some circumstances. Here, however, the record does not establish (*i*) that the pension manager had any hesitance in providing oral figures in response to specific requests for pension information, (*ii*) that he cautioned employees about the unreliability of such figures, (*iii*) that he notified employees, upon their making undifferentiated requests for information, that information in written as opposed to oral form was available upon request, or (*iv*) that there was sufficient time, given the one week time constraint placed by his employer upon acceptance of ιne buyout offer, for Sandler to observe any plan procedures that govern requests for written calculations and to obtain such a calculation.

by surprise. That conclusion is particularly unavoidable when, in addition, the decision in question is one in which the employer has a direct interest and upon which the employer has placed serious time constraints.

### (ii) The Detrimental Consequences of Sandler's Reliance

News' final argument in favor of summary dismissal is that Sandler suffered no economic detriment from relying on the false pension information. News states that by accepting the buyout, plaintiff reaped substantially greater financial rewards than he would have received had he rejected the termination offer.

In support of this thesis, News has submitted the affidavit of Thomas V. Luhn, current manager of compensation and employee benefits for the News, which contains a comparison of the value of the buyout package/early retirement pension that Sandler received (a $62,558 lumpsum payment plus a pension of $95,547, totalling $158,105) with the value of the pension he would have become entitled to at age 65 ($146,936), had he continued to work at the News until then in his capacity as foreman. On the basis of that comparison, News concludes that Sandler's decision to take the buyout did not cause him any detriment.

Plaintiff's counsel accepts for purposes of the motion the correctness of Luhn's pension calculations, but argues that the News' comparison fails to measure the full extent of Sandler's injury. The identified failing is that News has not taken into account the employment income Sandler has lost due to his induced departure from the News. As a condition of the buyout offer, Sandler relinquished what counsel describes as a "secure $50,000.00 per year position with the News" for "a far more tenuous employment situation" working as an occasional overflow mailer with the New York Times.

It is true that the News' comparison does not attempt to measure the value of the employment opportunities at the News that Sandler relinquished by accepting the buyout. Under New York law, Sandler's lost income should have been included, because a plaintiff's detriment is measured by "the actual pecuniary loss sustained as the direct result of the wrong." *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 682 (S.D.N.Y.1987) (quoting *Reno v. Bull,* 226 N.Y. 546, 553, 124 N.E. 144 (1919)). Since one immediate result of the buyout was Sandler's loss of his job at the News, defendant's comparison is faulty.

The record, however, does not support plaintiff's counsel's argument that what the News induced Sandler to forego was a "secure" $50,000 a year position as foreman. Plaintiff's unopposed 3(g) Statement contends only that Sandler had adequate seniority to avoid being laid off by the News in connection with its shutdown of its New Jersey insert operation. That proposition must be read together with News' 3(g) Statement, equally unopposed, that the foremen who declined the buyout risked layoff, "with the possibility of bumping back to journeymen status if they had sufficient seniority" to avoid layoff. In view of the requirement that inferences be drawn in favor of the party opposing a summary judgment motion, the conclusion forced upon the court is that Sandler would have been kept on by the News, but at the lesser position of journeymen.

Whether Sandler's reliance was detrimental thus turns upon a comparison of the economic condition Sandler would have been in had he refused the buyout and stayed on at the News as a journeyman, and the actual economic situation Sandler has experienced following his acceptance of voluntary termination.[13] This appraisal in-

---

13. Plaintiff's natural disappointment upon learning of the sizeable difference between Canfield's representation of the amount of his pension and the actual pension owed to him upon early retirement is itself irrelevant to the determination. New York's law of misrepresentation provides no basis for employing the falsely represented amount in computing the damages arising from reliance on the representation. Instead, damages are limited to actual losses sustained as a result of the reliance. *See e.g., Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 682 (S.D.N.Y.1987) (applying New York rule to reject claim seeking recovery of gains anticipa-

cludes, as a measure of mitigation, a reasonable valuation for substitute employment subsequently taken by Sandler at worksites other than the News (as well as any employment opportunities unreasonably foregone) and any growth in Sandler's pension benefits arising from such alternative employment. *See Wilmot v. State*, 32 N.Y.2d 164, 344 N.Y.S.2d 350, 352–353, 297 N.E.2d 90, 92–93 (1973) (party seeking damages has "the active duty of making reasonable exertions to render the injury as light as possible"), *quoted in Vogt v. Abish*, 663 F.Supp. 321, 324 (S.D.N.Y.1987).

In light of the relevance of these factors, on this record it is impossible to conclude one way or another whether Sandler in fact suffered economic injury that resulted directly from his reliance on the false information communicated to him by the News. Although the News' uncontroverted 3(g) Statement establishes that Sandler obtained work producing offsetting earnings amounting to about $12,00 over eleven months of 1988 (and that he refused additional employment offers that would have enlarged those earnings), News has not placed in the record the level of compensation that would have been paid to Sandler had he continued working at the News' in the position of journeyman. The failure of News to incorporate that highly relevant component of Sandler's monetary loss in its calculations precludes any finding that Sandler's reliance did not redound to his detriment.

For the above reasons, News' motion for summary judgment is denied, insofar as it relates to Sandler's negligent misrepresentation claim. News has failed to establish that it did not expect Sandler to rely on the erroneous material information its pension

manager communicated to him in the course of his decision whether to accept the buyout offer, nor has it shown that Sandler's reliance on that information was unreasonable or unharmful.

### D. *Sandler's Cross–Motion for Summary Judgment*

■ Summary judgment may be awarded to Sandler only if the record establishes his satisfaction of each element of the negligent representation cause of action. In at least one respect already adverted to, Sandler has failed to meet that burden. As discussed above, the record as it now stands does not establish whether or not Sandler sustained any "net" detriment as a result of his decision to accept the News' buyout offer.

That determination requires additional information that neither plaintiff or defendant has chosen to include within its submissions. In overcoming defendant's argument that Sandler in fact sustained a net benefit from his termination decision, plaintiff's counsel properly points to the relevance of the value of Sandler's lost employment at the News, and correctly notes the infirmity of the News' financial comparisons in view of that oversight. Counsel for plaintiff has failed to cure that oversight, however, because he has neglected to place in the record an undisputed valuation of the employment Sandler relinquished. Absent that information, it is impossible to conclude that Sandler's reliance on his employer's mistake caused him economic detriment.[14]

### Conclusion

For the reasons set forth above, News' motion for summary judgment is granted

---

ted because of false representation). Canfield's pension figure of $1049 bears no relation to Sandler's actual loss, since Sandler could not have attained a pension benefit of that amount even had he worked at the News until he accrued his maximum service credit.

**14.** In view of that failing, it is pointless at present to discuss at any length whether plaintiff has met all of the other requirements that must be satisfied to recover on a claim of negligent representation. That Sandler reasonably relied upon information directly communicated

to him by the News, and that the News had adequate reason to know that such information would be relied upon by Sandler in making his buyout decision, are conclusions that have already been explained. The present record also contains support for Sandler's contentions that the information in question was both false and carelessly imparted to him, factual matters which News has failed to oppose by affidavits or otherwise. Pursuant to Rule 56(d) and (e), Fed. R.Civ.P., those facts are determined to be without substantial controversy.

**520**

in part and denied in part. The complaint's second and third claims are dismissed with prejudice. Plaintiff's cross-motion for summary judgment is denied. The Pretrial Order will be filed on October 4, 1989 and the action added to the Ready Trial Calendar. Settle judgment on notice.

It is so ordered.