970 F.2d 1165
 15 Employee Benefits Cas. 1729
 Edwin KOTROSITS, Julius Ruggeri, Marvyn Souders, on their
own behalf and on behalf of all others similarly situated,
Reuben Aldrich, Alexander Christie, Walter C. Gothe, Paul W.
Nielsen, Russell E. Scheirer
v.
GATX CORPORATION NON-CONTRIBUTORY PENSION PLAN FOR SALARIED
EMPLOYEES, Appellant.
 No. 91-1410.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 16, 1991.
Decided July 6, 1992.
 
 Herbert L. Zarov, Kenneth E. Wile (argued), Mayer, Brown & Platt, Chicago, Ill., Robert L. Hickok, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellant.
 Kevin T. Fogerty (argued), Traub, Butz & Fogerty, P.C., Allentown, Pa., for appellees.
 Before: STAPLETON, SCIRICA, and ROTH, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 I.
 
 1
 At the end of 1986, the GATX Corporation and its subsidiary, General American Transportation Company (GATC), sold all of the stock of GATC's subsidiary, Fuller Company, to FA Holding Company, an entity owned by Fuller management and a private investor. Plaintiffs are Fuller employees who claim they were entitled to enhanced early retirement benefits under the GATX Pension Plan as a result of the sale. The district court agreed and reversed the decision of the Plan Administrator to deny these benefits. We will reverse the judgment of the district court.
 
 II.
 
 2
 The parties have stipulated to most of the relevant facts. At the time of the sale of the Fuller Company stock, approximately 600 Fuller employees were participants in the GATX Corporation Non-Contributory Pension Plan for Salaried Employees ("the Plan"). This Plan was a funded, defined benefit, non-contributory pension plan covering the employees of GATX Corporation and a number of its affiliated corporations. As the district court noted:
 
 
 3
 The GATX Plan offers the following retirement options: (1) normal retirement (age 65); (2) 62/15 (unreduced benefit at age sixty-two provided that the employee has fifteen years of service); (3) 90 points (unreduced benefit available provided that the employee's age and years of service add up to ninety); (4) 75/80 points (unreduced benefit available in the event of plant shutdown, layoff, extenuating circumstances or disability available (i) when the employee is at least fifty-five and the employee's age and years of service add up to seventy-five or (ii) when the employee's age and years of service add up to eighty); and (5) 55/15 (retirement with an actuarially reduced benefit for employees who are at least fifty-five with fifteen years of service).
 
 
 4
 Kotrosits v. GATX Corp. Non-Contributory Pension Plan, 757 F.Supp. 1434, 1437 (E.D.Pa.1991).
 
 
 5
 Here at issue is the 75/80 early retirement pension. For those who have not attained the age of 62 or an age and service time totaling 90, the 75/80 early retirement pension offers the only opportunity of receiving enhanced, early retirement benefits--that is, benefits that are not determined by actuarially reducing full pension benefits available at 65. The Plan provision governing the 75/80 pension stipulates:
 
 
 6
 4.5 75-80 Points Retirement. An Employee with at least 15 years of Service Credit who has not attained age 62, who either (i) has attained age 55 and whose age and Service Credit total at least 75, or (ii) whose age and Service Credit total at least 80, and
 
 
 7
 (a) who has a Termination of Employment due to permanent shutdown of a plant, department or subdivision thereof, or due to layoff or disability, or
 
 
 8
 (b) whose retirement is granted by and at the sole discretion of the Company, based on health impairment or other extenuating circumstances,
 
 
 9
 may retire on the first day of the calendar month following the calendar month in which the applicable requirements of this Section 4.5 have been met.
 
 
 10
 Joint Appendix (hereinafter "J.A.") at 367-68.
 
 
 11
 Under the Plan, the Plan Benefits Committee is given the responsibility of making authoritative determinations concerning the meaning of the Plan and the scope of its benefits. That Committee is authorized:
 
 
 12
 (b) To construe the Plan and Trust Agreement;
 
 
 13
 (c) To determine all questions arising in its administration, including those relating to the eligibility of persons to become Participants; the rights of Participants and their beneficiaries; and its decisions thereon shall be final and binding upon all persons hereunder.
 
 
 14
 J.A. at 382.
 
 
 15
 Under the Fuller Company Stock Purchase Agreement, the closing date of December 31, 1986, effected "a termination of employment under the terms of [the Plan] for all Fuller Participants." J.A. at 497. While the Plan remained responsible for all pension benefits accrued under the Plan as of that date, including those of shorter-term employees whose benefits had not yet vested, the Fuller Participants could accrue no additional benefits after that date.[1] Before the closing date, Fuller management announced its intention to sponsor a new Fuller Pension Plan, but such a plan was not in place at the time of closing. Under the new Fuller Plan as later established, pension benefits accrued for the Fuller Participants but at a slightly less favorable rate and did not vest for five years. Fuller was not contractually bound to GATX to sponsor its own Plan.
 
 
 16
 Prior to the closing, GATX had a medical and life insurance program that included its retirees. This was an unfunded program having no connection with the Plan other than their common sponsorship. GATX management made a decision to provide lifetime medical and life insurance to those Fuller employees who were in the employ of its subsidiary at the time of their retirement, but not to provide such coverage for Fuller employees who retired after Fuller had severed its connection with GATX. Thus, a Fuller employee who was entitled to retire as of the closing date but who had not filed an application for pension benefits would receive no medical or life insurance from GATX's program when he or she retired from Fuller.
 
 
 17
 In the months preceding the closing date, Fuller management discussed the possibility of reducing the number of Fuller employees after the sale. No list of job positions that might be eliminated was ever shown to anyone at GATX, however; indeed, GATX executives were told by Elmer Gates, the President, Chief Operating Officer, and soon-to-be Chairman of the Board of Fuller that "[w]e're going to hit the ground running. We look to continue the Fuller operation." 757 F.Supp. at 1439. On the first business day after January 1, 1987, all Fuller Company facilities in existence prior to the sale were open for business and continued manufacturing and selling the same products that Fuller Company manufactured and sold prior to December 31, 1986.
 
 
 18
 Plaintiffs are Fuller employees who were Plan participants prior to the sale and who would have been eligible for 75/80 benefits in the event of a plant closing, layoff, disability, or management-recognized extraordinary circumstances. One subclass, represented by plaintiffs Edwin Kotrosits and Julius Ruggeri, consists of employees who were eligible for early retirement under the 55-15 provision as of the closing date of December 31, 1986, but were not yet eligible under any other retirement options in the absence of one of those events. These employees retired before the closing date and retained their lifetime medical and life insurance coverage. The other subclass, represented by plaintiff Marvyn Souders, consists of employees who were not yet 55 years old at the time of the sale and who therefore could take early retirement, if at all, only under the 75/80 provision. Both subclasses insist that they are entitled to 75/80 benefits.
 
 
 19
 None of the plaintiffs knew for certain whether they would have jobs with Fuller after the closing day, Wednesday, December 31, 1986. Plaintiffs Kotrosits and Ruggeri were told shortly before that date that they would receive a telephone call on the morning of Friday, January 2, 1987, instructing them whether to report to work. Both received a call that morning informing them that they did indeed have a job. Plaintiff Souders was told before the date of the sale to report to work on January 5, at which time he would be told whether his continued services would be needed.[2] Like the other plaintiffs, Souders continued to perform the same duties after the sale.
 
 
 20
 After the Fuller sale, the class representatives pursued their claims for 75/80 benefits under the procedure set out in the Plan. They first presented their claims to the Plan Administrator, who denied them on the grounds that there had been no closing of a plant, department, or division, there had been no layoff, the claimants were not disabled, and a transfer of stock where the business continued was not an exceptional circumstance under 4.5(b) in the judgment of the Company. Kotrosits, Ruggeri, and Souders separately appealed the Administrator's decision to the Plan Benefits Committee, which consisted of the Chief Executive Officer of GATX, the Vice President and General Counsel of GATX, and the Vice President of Human Resources of GATX. The Benefits Committee, after a meeting which was also attended by the Administrator and two other GATX attorneys, approved the Administrator's decision and denied the appeal based on the following factors: (1) GATX sold Fuller as a going concern; (2) Fuller had retained essentially the same employees as had been employed there before the sale; (3) Kotrosits, Ruggeri, and Souders all continued to work at Fuller; and (4) the Fuller sale resembled the prior Marine Transport Lines, Richmond Terminal, and GARD transactions, where no 75/80 benefits had been afforded, and did not resemble the Pollock and GATX Tank Erection Corporation ("TEC") transactions or the GATC Sharon, Pennsylvania, plant shutdown where 75/80 benefits had been applied for and granted.
 
 
 21
 In the Marine Transport Lines, Richmond Terminal, and GARD transactions, a stock dividend splitoff and two asset sales, GATX had sold portions of its operations as going businesses and virtually all employees continued working in those businesses after the sales. No 75/80 benefits were paid in connection with any of these transactions. In the Pollock, TEC, and GATX Sharon transactions, plant shutdowns were involved and the employees lost their jobs. 75/80 benefits were paid.
 
 
 22
 Plaintiffs filed suit in the district court under the Employee Retirement Income Security Act of 1974 ("ERISA") to challenge the defendant's denial of their applications for 75/80 benefits.[3] The district court found that the Plan Administrator and the Benefits Committee had operated under a conflict of interest and refused to defer to their decision. The district court went on to hold that the plaintiffs had suffered a "layoff" within the meaning of the Plan when they were terminated as of December 31, 1986. The district court thus agreed with plaintiffs that the Plan's denial of their 75/80 benefits constituted an abuse of discretion. Its opinion concludes with the following summary of its views:
 
 
 23
 In sum, this court concludes that parties to a corporate sale of stock or assets must fully safeguard the pension rights of the corporate employees in the selling documentation. If, as in this case, the structure of the sale results in a portion of the transaction costs being shifted to the employees of the entity being sold, courts should scrutinize the corporate sale closely. Because ERISA imposes obligations on plan fiduciaries and sponsors that cannot be evaded by subterfuge, federal courts will not countenance tactics such as those employed by GATX in conjunction with the Fuller sale. Therefore, this court will order the Plan to award 75/80 point pensions to the Fuller salaried employees who met the age and years of service requirements as of December 31, 1986.
 
 
 24
 757 F.Supp. at 1461.
 
 III.
 
 25
 After the transfer of Fuller stock in the leveraged buyout, the employees remained employed by the same company, under the same management, at the same place, doing the same jobs, under the same conditions, for the same direct compensation. They lost no work time and accordingly no direct compensation. They were, however, affected by the transfer in three ways: First, when they left work on December 31, 1986, they did not know whether they would be working at Fuller come the new year. Second, prior to the transaction, they had vested accrued benefits under the Plan and an expectation of future benefit accruals under the Plan, the latter being subject, however, to reduction or elimination at the discretion of GATX. Immediately after the transaction, the employees still had their vested accrued benefits under the Plan, but their expectation of future accruals had been replaced with the possibility of future accruals under a yet-to-be adopted Fuller Pension Plan. Finally, prior to the transaction, the Fuller employees had an expectation of lifetime medical and life insurance benefits from GATX, subject, however, to the right of GATX to modify or eliminate the program giving rise to that expectation. Once the new year began, those who remained with Fuller no longer had an expectation of such benefits from GATX. The record does not disclose what medical or life insurance benefits were available to Fuller employees from Fuller after the sale.
 
 
 26
 The parties agree that the transaction occasioned a termination of employment with a GATX affiliate for purposes of applying the Plan. The Plan provides a right to 75/80 benefits, however, only where there is a termination due to the permanent closing of a plant, department, or division, due to a layoff or due to disability. The issue in this case is thus whether employees in the position of these plaintiffs come within the intended scope of the class described in the Plan as employees terminated by "layoff." The district court concluded that they are:Although concern about future employment does not constitute a layoff, temporary suspension of employment at the will of an employer certainly does.
 
 
 27
 757 F.Supp. at 1459.
 
 
 28
 It is difficult to take issue with the district court's definition of a "layoff." The Plan can and does take issue, however, with the district court's view that what happened over the New Year's holiday break was a suspension of work. In the Plan's view, an employee who has lost no work time or salary cannot be said to have been "suspended from work" or "laid off." It stresses that each of the other two situations which trigger a 75/80 pension benefit under 4.5(a)--"permanent shutdown of a plant, department or subdivision thereof," and "disability" involves the loss of work and salary, and insists that layoff should therefore be given its commonly understood meaning. The Plan further suggests that loss of a job was obviously intended to be the justification for granting an enhancement above an actuarially reduced pension and that 75/80 benefits should not be available in the absence of such a justification.
 
 
 29
 We agree with the Plan that the most common understanding of a layoff is a situation involving a loss of work time and direct compensation. Moreover, loss of direct compensation does provide a ratio decidendi for awarding enhancement. On the other hand, we have noted that severance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer. See Ulmer v. Harsco Corp., 884 F.2d 98, 103 (3d Cir.1989); Bruch v. Firestone Tire and Rubber Co., 828 F.2d 134, 146 (3d Cir.1987), reversed on other grounds, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In Bruch, for example, we suggested that, at least in some circumstances, severance pay benefits triggered by a "reduction in force," a concept which also generally includes a loss of employment and compensation, might be payable where assets are sold as a going concern and employment continues.
 
 IV.
 
 30
 Before proceeding further, it is necessary to determine how much deference, if any, the district court should have accorded to the Benefits Committee's construction of the Plan. We therefore turn to that issue.
 
 
 31
 The Supreme Court recently spoke of the degree of deference due ERISA plan fiduciaries in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Noting that ERISA "abounds with the language and terminology of trust law," id. at 110, 109 S.Ct. at 954, and after a brief examination of trust law sources, the Court found that de novo review of benefit eligibility determinations is usually appropriate. Id. at 112, 109 S.Ct. at 955. General principles of trust law, however, do allow parties to agree to a narrower standard of review. Id. at 115, 109 S.Ct. at 956. If a benefit plan invests the administrator with discretionary authority to determine eligibility for benefits under a plan, his decision must be reviewed under the more deferential "arbitrary and capricious" standard. Id. Finally, the Court instructed that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " Id., quoting Restatement (Second) of Trusts § 187, Comment d (1959).[4]
 
 
 32
 As formulated by the Supreme Court, then, the "arbitrary and capricious" standard in this context is shaped by the circumstances in which the administrator makes his decision. The Court thus implicitly adopted the position of some lower courts which had previously held that, where the claimant demonstrates that it would be inequitable to defer to the plan administrator, stricter scrutiny of his decision is in order. See Bruch, 828 F.2d at 139-40; Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1052-53 (7th Cir.1987).
 
 
 33
 The Plan involved in this case gives the broadest possible interpretational authority to the Benefits Committee. The district court found, however, that the circumstances attending the Committee's decision were such that close scrutiny was appropriate. Specifically, the district court declined to give any deference to the Committee's decision for four reasons. First, it concluded that GATX's duty to guarantee the actuarial soundness of the Plan created a conflict of interest which justified disregarding the Committee's decision. Second, it found that GATX and the Plan fiduciaries had been guilty of "bad faith." Third, the court noted that Plan fiduciaries rested their decision in part on the unavailability of 75/80 benefits in earlier transactions which the district court thought to be distinguishable. And finally, the district court concluded that close scrutiny rather than deference was appropriate because GATX had failed to "fully safeguard the pension rights of the ... employees in the selling documentation." 757 F.Supp. at 1461. In their briefing and argument before us, plaintiffs have urged that no deference is in order but have advanced somewhat different arguments in support of that proposition.
 
 
 34
 If we agreed with the view of either the district court or plaintiffs regarding the significance of the circumstances under which the Committee's decision was made, a reduced level of deference would be appropriate. For the reasons given below, however, we do not agree that the circumstances of the Committee's decision, or its stated rationale, indicate a danger of bias.[5]
 
 
 35
 The district court acknowledged that the Plan conferred discretion on the Benefits Committee to determine whether benefits are payable. It further recognized that even where, as here, the Plan fiduciaries consist of management personnel, "the expense imposed on the sponsor of a fully funded plan will not usually create cause for searching judicial review." Id. at 1456. Nevertheless, the district court concluded that "the unique circumstances of this case" involved a conflict of interest that made deference inappropriate and required a "searching judicial review." It identified that conflict as follows:
 
 
 36
 [T]he fact that the denial affected a large number of employees and resulted in estimated savings of at least two million dollars for the Plan undermines the rationale for deferential review. The larger the expenditure, the greater the possibility that the sponsor will eventually have to replenish the Plan's funds.
 
 
 37
 Id.
 
 
 38
 While the district court recognized that the two million dollars payable in 75/80 benefits would be the responsibility of the Plan and not GATX, it correctly noted that the Plan's liability for these benefits would render it more likely that GATX would be called upon to make future contributions in satisfaction of its duty to maintain the actuarial soundness of the Plan. The district court made no more specific finding about the likelihood of GATX ultimately bearing the economic burden of any additional 75/80 benefits.
 
 
 39
 The record indicates that at all relevant times the market value of the Plan's assets far exceeded the benefits accrued to date based on current pay and service. As of January 1, 1986, the last audit date preceding the sale, the Plan assets had a market value of $103,584,044 and the value of all accrued benefits was $94,796,280, leaving a surplus of $8.79 million. As of January 1, 1987, the day after the closing date, the Plan assets had a market value of $114,380,313 and the value of all accrued benefits was $104,184,071. There was thus a surplus of approximately $10.2 million at the time of the sale. It is, of course, impossible to predict the future, and it remains true that a Plan liability for $2 million in 75/80 benefits, even when amortized over a 15-year period,[6] makes "greater the possibility that [GATX] will eventually have to replenish the Plan's funds." 757 F.Supp. at 1456. Nevertheless, this record shows only an unquantified possibility that a different ruling from the Committee would have had a significant economic impact on GATX.
 
 
 40
 Where the sponsor of a Plan reserves for the Plan administrators the discretion to interpret the Plan, anyone urging that a court disregard that reservation has the burden of showing some reason to believe the exercise of discretion has been tainted. Brown v. Blue Cross and Blue Shield of Ala., Inc., 898 F.2d 1556, 1566 (11th Cir.1990). As noted above, where such a party shows the kind of conflict of interest that could realistically be expected to bias the decision makers, Bruch counsels in favor of withholding deference. Where, as here, however, the record shows no direct impact on the Plan sponsor and only a possibility of future indirect consequences to it, we conclude that it is appropriate to enforce the Plan as written and defer to the discretion of the Plan fiduciaries.
 
 
 41
 This conclusion is consistent with our prior cases and the cases from other circuits that have examined similar issues. In the Bruch case, when we first suggested that the degree of deference afforded to decisions of plan administrators should be reduced by a significant conflict of interest, we gave as examples unfunded plans where benefits come directly from the sponsor's assets and funded plans where the sponsor's contributions each year are determined by the cost of satisfying plan liabilities in the immediately preceding year. 828 F.2d at 137-38. In such situations, there is a substantial likelihood that the cost of additional benefits will be borne by the sponsor, the employer of the plan administrators. Neither we nor any other court of appeals of which we are aware, however, has suggested that a sponsor's duty to maintain the actuarial soundness of a funded plan with a substantial surplus is alone enough to require de novo review. See De Nobel v. Vitro Corp., 885 F.2d 1180, 1191 (4th Cir.1989) (no "presumptive bias" is attributable to administrators of fully funded, defined benefit plan); Lowry v. Bankers Life and Casualty Retirement Plan, 871 F.2d 522, 525 n. 7 (5th Cir.1989) (suggesting that no conflict of interest is inherent in defined benefit plans where employer merely guarantees actuarial soundness of plan); Oster v. Barco of California Employees' Retirement Plan, 869 F.2d 1215, 1217-18 (9th Cir.1988) (although any decision which enhances the financial viability of the plan reduces potential for employer contributions, this is not sufficient to prove conflict of interest; "[a] contrary conclusion would mean that we must always consider trustees of a defined benefit plan as subject to a conflict of interest, which we are unwilling to do"). See also Woolsey v. Marion Labs. Inc., 934 F.2d 1452, 1459-60 (10th Cir.1991) (mere possibility that administrators of profit-sharing plan could benefit from denial of former employee's request that he receive part of his benefit in employer's stock is insufficient to show presumptive conflict of interest).
 
 
 42
 The district court also cited two instances of "bad faith" in support of its decision to deny deference. It first faulted GATX's managerial staff for not telling Fuller employees whether they would have jobs after the sale. It then criticized the "Plan trustees" for "coerc[ing] the plaintiffs into accepting actuarially reduced benefits by threatening the loss of lifetime medical and life insurance benefits." 757 F.Supp. at 1457. We find both of these criticisms puzzling. Neither seems warranted by the record and both appear unrelated to the Committee's decision to deny 75/80 benefits. The parties stipulated and the district court found, as follows:
 
 
 43
 33. Mr. Gates never directly told anyone at GATX or the Plan that there was a possibility of a reduction in force at Fuller being discussed by the members of F A Holding.
 
 
 44
 34. Prior to the December 31, 1986 sale date, F A Holding did not provide Mr. Herbert, the Plan Administrator, with any information identifying what persons, if any, Fuller intended to terminate following the sale.
 
 
 45
 35. No list of job positions that might be eliminated at Fuller after the sale was ever shown to anyone at GATX.
 
 
 46
 36. Mr. Herbert understood that F A Holding was buying Fuller as a "continuing business."
 
 
 47
 37. Mr. Gates of F A Holding advised GATX that Fuller was being sold as a continuing business.
 
 
 48
 757 F.Supp. at 1439. Assuming, however, that someone at FA Holding did tell GATX or the Plan about its tentative post-closing business plans, we do not see how GATX or the Plan can be found responsible for failing to advise the employees of possible actions over which they had no control, or how their failure to so inform represents an act of bad faith.
 
 
 49
 With respect to the alleged coercion of the Ruggeri subclass, we note that the Plan had nothing to do with the decision not to extend GATX's medical and life insurance program to employees who retired after the closing. Moreover, as the district court acknowledged, GATX had no legal obligation to extend that program to retirees from an unaffiliated firm. Finally, we do not understand the coercive aspect of the situation. The Ruggeri subclass had the choice to take early retirement or not to take early retirement. By taking early retirement and availing itself of GATX's insurance program, that group did not sacrifice its claim to enhanced, early retirement benefits. If that group were entitled to enhanced benefits, it could recover them in this suit.
 
 
 50
 The district court distinguished the Fuller transaction from the prior transactions in which the Plan denied 75/80 benefits on the basis that in the earlier cases "the employees continued working for the new owner with their pension rights largely unaffected by the sale or spinoff." 757 F.Supp. at 1457. It will be recalled that the Committee, in concluding that a "termination by reason of layoff" required a loss of work, relied in part on the fact that in prior situations 75/80 benefits had not been paid when the employees lost no work and had been paid when the employees had lost work. We agree with the district court that the Fuller transaction was different in the described way from the earlier transactions in which 75/80 benefits were not paid. Nevertheless, we do not view the Committee's reasonable reliance on a perceived correlation between a loss of work and 75/80 benefits as rendering suspect the Committee's exercise of its discretion.
 
 
 51
 Finally, the district court's summary of its conclusion reveals that it was deeply troubled by GATX's failure to secure a commitment from Fuller to assume responsibility for the pension benefits that, absent a modification or termination of the Plan or the sale to Fuller, would have accrued in the future under the Plan. In the district court's view, this defalcation should occasion close scrutiny of the decision to deny 75/80 benefits. We understand the district court's concern that benefits under the new Fuller Pension Plan were lower than those under the GATX Plan.[7] At the same time, when GATX established the Plan, it neither agreed to guarantee nor agreed to get anyone else to guarantee that employees would be able to accrue benefits at the initial Plan rates for the work life of the employees. As we have made clear on prior occasions, Congress made a deliberate decision that ERISA would not require such a guarantee from the sponsoring employer. Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1161-62 (3d Cir.1990). It follows that GATX's failure to "fully safeguard" the pension expectations of Fuller employees does not provide a justification for refusing to defer to the judgment of the Committee regarding the availability of 75/80 benefits.
 
 
 52
 We thus conclude that the district court identified no basis for disregarding the delegation of discretion to the Plan Benefits Committee. Similarly, we conclude that the somewhat different tack taken by the plaintiffs before us is unpersuasive.
 
 
 53
 The plaintiffs make two additional arguments before us concerning the scope of review. First, they insist that the GATX Plan was in fact underfunded at the time of the transaction. They point out that the Plan's "accrued benefit" figure "includes only benefits earned as of the valuation date; it does not anticipate future service or future salary increases which will undoubtedly occur." Brief for Appellee at 10, n. 8. Plaintiffs assert that when future accruals are taken into account, the "accrued liability" of the Plan as of January 1, 1987, was $116,424,087, which was $2,043,774 greater than the $114,380,313 market value of the Plan assets on that date. It appears to us that the plaintiffs are comparing apples and oranges when they contrast an accrued liability figure including future accruals with current market value of the assets, but, whether or not that impression is accurate, the fact remains that the record will not justify de novo review. Plaintiffs have tendered nothing from which the district court could find a substantial likelihood of a significant adverse impact on GATX from the grant of 75/80 benefit to the plaintiffs.
 
 
 54
 The record is also not sufficiently developed to permit acceptance of plaintiffs' final theory. Plaintiffs argue before us for the first time that a Committee decision granting 75/80 benefits would have entitled the Souders subclass to early retirement prior to the sale and would have thereby exposed GATX to additional expense in connection with its medical and life insurance program. The record is devoid of any evidence, however, regarding this program or the costs associated with it.[8] There is, accordingly, no basis here for concluding that the Committee had a conflict of interest.
 
 
 55
 In summary, we find no justification in this record for failing to give effect to the provisions of the Plan granting discretion to the Benefits Committee to determine the availability of benefits. Accordingly, we hold that the district court should have determined only whether the Committee's view of a "termination due to layoff" was a reasonable one.
 
 V.
 
 56
 Section 4 of the Restatement (Second) of Trusts (1959) provides:
 
 
 57
 The phrase "terms of the trust" means the manifestation of intention of the settlor with respect to the trust expressed in a manner which admits of its proof in judicial proceedings.
 
 
 58
 Comment d. to this section of the Restatement explains the proper approach to the interpretation of the provisions of a written instrument creating an inter vivos trust:
 
 
 59
 If a trust is created by a transaction inter vivos and is evidenced by a written instrument, the terms of the trust are determined by the provisions of the instrument as interpreted in the light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible because of the Statute of Frauds, the parol evidence rule, or some other rule of law.
 
 Comment a. adds:
 
 60
 The manifestation of intention of the settlor is the external expression of his intention as distinguished from his undisclosed intention.
 
 
 61
 . . . . .
 
 
 62
 The intention of the settlor which determines the terms of the trust is his intention at the time of the creation of the trust and not his subsequent intention. The intention of the settlor at the time of the creation of the trust may, however, be shown by facts occurring after that time to the extent that evidence of such facts is admissible to show such intention under the rules of evidence.
 
 
 63
 The Plan Benefits Committee had before it the relevant text of the Plan and the history of the administration of that text at the times of corporate transactions affecting participants. No one tendered evidence of other surrounding circumstances alleged to be helpful in ascertaining the sponsor's intent at the time the Plan was established.
 
 
 64
 As we have earlier noted, the text of the Plan conferred upon the Benefits Committee discretion to determine the original intent of the sponsor. As far as the remaining relevant text of the Plan is concerned, we conclude that the Committee's interpretation was clearly a reasonable one. The text of § 4.2, read literally, provides that 75/80 benefits are triggered not by every termination of employment but rather only by those terminations which result from a permanent closing of a plant, department, or division, a layoff, or disability. As the district court recognized, a "layoff," in common parlance, involves a suspension of employment, which we believe, in common parlance, involves the loss of some work time and direct compensation. Moreover, looking at the benefit provisions of the Plan as a whole, construing the plan as the Committee does provides a coherent raison d'etre for the enhancement bestowed by § 4.2.
 
 
 65
 The case law existing at the time of the Committee's denial of benefits provided support for its view. See, e.g., Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1149 (4th Cir.1985) (denial of severance benefits "reasonable" where plan provided for severance upon "job termination" and employees of company subsidiary continued to work in same jobs upon sale of subsidiary to new parent), cert. denied 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); Sly v. P.R. Mallory & Co., 712 F.2d 1209, 1212-13 (7th Cir.1983) (denial of severance "reasonable" where plan provided benefits in event of "separation caused by reduction in force" and claimants continued to work in same jobs upon sale of subsidiary); Esler v. Northrop Corp., No. 20537-B (W.D.Mo. Aug. 4, 1981) (where plan called for pension benefits upon "layoff", claimants had no right to pension where they continued to work in the same job with successor employer).
 
 
 66
 Courts facing the issue more recently have also confirmed the reasonableness of the Committee's decision. See, e.g., Blank v. Bethlehem Steel Corp., 926 F.2d 1090, 1092 (11th Cir.1991) (upholding administrator's decision that early retirement benefits triggered by "layoff or disability" were not available where claimants continued in same job with successor employer), cert. denied, --- U.S. ----, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); Rowe v. Allied Chem. Hourly Employee Pension Plan, 915 F.2d 266, 269 (6th Cir.1990) ("it is clear that, even under a de novo interpretation of the Allied Plan, the ... plaintiffs' separation from Allied and immediate employment with Armco ... did not constitute a layoff"); cf. Harper v. R.H. Macy & Co., Inc., 920 F.2d 544, 545 (8th Cir.1990) ("the plan's language does not permit an interpretation that employees who continue to work without interruption on comparable terms for the purchaser of their employer's business have been 'permanently terminated' by the sale").[9]
 
 
 67
 Turning from the text of the Plan to its administration, the Committee correctly noted that 75/80 benefits had not been paid when, on three prior occasions, portions of GATX's business had been sold as a going concern and the employees had continued to work without interruption. It may be true, as the district court stressed and as noted above, that on each of those three occasions the employees' pension benefits were "largely unaffected" by the transaction and arguably this reduces their value as precedent in this particular situation. Even if that argument be accepted, however, there still would be no evidence of prior Plan administration suggesting that the sponsor intended for 75/80 benefits to be paid in a situation of this kind.
 
 
 68
 In sum, the Benefits Committee has tendered a reading of § 4.2 that fits comfortably with the text of that section and the remainder of the Plan and does not conflict with any other evidence regarding the intent of the sponsor. As we have indicated, it is unnecessary for us to conclude that the Committee's reading fits more comfortably with the evidence of the sponsor's intent than that of the plaintiffs. It suffices to find, as we do, that the Committee's reading is a reasonable one. Bruch, 109 S.Ct. at 954.
 
 VI.
 
 69
 For the reasons given above, we will reverse the decision of the district court and direct the entry of a judgment consistent with the decision of the Benefits Committee.
 
 
 
 [1]
 The Stock Purchase Agreement also contained an indemnification clause, whereby GATX undertook to indemnify and defend Fuller against any claims alleging that Fuller employees are owed subsidized early retirement benefits under the Plan, or under any pension plan maintained by Fuller, as a result of the leveraged buyout and the provisions of the Plan
 
 
 [2]
 Plaintiff Souders worked at the Fuller Bethlehem facility, where the first business day of 1987 was Monday, January 5. Plaintiffs Kotrosits and Ruggeri worked at the Fuller Catasaqua plant, where the first business day of 1987 was Friday, January 2
 
 
 [3]
 Sections 502(a) and (e) of ERISA, 29 U.S.C. § 1132(a) and (e), provide that participants in pension plans may bring civil suits in federal district court to recover benefits due under the terms of the plan
 
 
 [4]
 This provision of the Restatement provides as follows:
 d. Factors in determining whether there is an abuse of discretion. In determining the question whether the trustee is guilty of an abuse of discretion in exercising or failing to exercise a power, the following circumstances may be relevant: (1) the extent of the discretion conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising or refraining from exercising the power; (6) the existence or nonexistence of an interest in the trustee conflicting with that of the beneficiaries.
 
 
 [5]
 Findings of fact regarding the existence of interests that may affect decisions of an administrator are reviewable under the "clearly erroneous" standard. Sullivan v. Cuyler, 723 F.2d 1077, 1082 (3d Cir.1983). The same is true for a finding of bad faith. Ford v. Temple Hospital, 790 F.2d 342, 347 (3d Cir.1986). Nevertheless, while the district court's factual determinations regarding the circumstances under which the Committee's decision was made are entitled to a presumption of correctness, the court's decision that these circumstances warrant a reduced level of deference is a legal question subject to plenary review. See In re Diaz Contracting, Inc., 817 F.2d 1047, 1055 (3d Cir.1987). In order to determine the proper level of deference due the committee's decision, we must therefore undertake an independent evaluation of the significance of the alleged bias
 
 
 [6]
 The record shows that the impact on Plan assets of a different decision from the Committee would have been spread over a 15-year period
 
 
 [7]
 The extent to which pension benefits will decrease under the Fuller Plan is a matter of some disagreement. Defendants have produced expert testimony to the effect that, if 75/80 benefits are denied, the projected pension benefits of the Ruggeri subclass will decrease by 6.24% while those of the Souders subclass will decrease by 26.61%. Plaintiffs, on the other hand, predict that the benefits of the Ruggeri subclass will decrease by 31.08%, and those of the Souders subclass will decrease by 36.95%. These projections, of course, assumed that pension rates under the two plans would remain constant. In the event that 75/80 benefits are granted as a result of the Fuller sale, and plaintiffs continue to work and earn credit toward a second Fuller Company pension, defendants project that the Ruggeri and Souders subclasses would enjoy pensions 22% and 60% higher than if the sale had never occurred, while plaintiffs contend that these benefits will increase by 8.36% and 35.87%, respectively. Joint Appendix at 155, 189-90
 
 
 [8]
 GATX represents in its briefing that if plaintiffs had raised this issue before the close of the evidence and the issuance of the district court's decision, the Plan would have submitted evidence showing (a) the cost of providing benefits for the 24 members of the Souders subclass was insignificant when compared to GATX's annual expense in providing benefits for the current 4,000+ plan members and (b) the cost of providing benefits to the subclass would be further reduced because GATX's obligations arise only when the participant's current health insurance is inadequate--and the entire Souders subclass was due to receive health insurance from Fuller company
 
 
 [9]
 Appellees cite several cases holding that employees were entitled to pension or welfare benefits upon the sale of their employer despite the fact that their jobs were not interrupted; but these plans contained language different from that of the Plan in this case. In Bellino v. Schlumberger Technologies, Inc., 944 F.2d 26 (1st Cir.1991), employees who were "terminated" due to "lack of work" were entitled to severance pay under their benefit plan; the court held that maintenance workers who were terminated by one employer upon cancellation of a maintenance contract and subsequently rehired by another, and who continued to perform the same work without missing a day of employment, met both of these conditions. Id. at 30-33. See also Ulmer, 884 F.2d at 102-04 (plan stating that "when employment is terminated, the [employer] ... will make severance payment" entitles employee to severance where termination results from sale of company division, but employees retain their jobs under new employer); Harris v. Pullman Standard, Inc., 809 F.2d 1495, 1498-99 (11th Cir.1987) (employees offered jobs by purchaser company entitled to severance where benefit plan stated "for all involuntary terminations, other than lay-off, the termination allowance will be granted"; layoff was explicitly defined in plan as separation from employer with intention of later recall); Blau v. Del Monte Corp., 748 F.2d 1348, 1354-55 (9th Cir.1984) (employees of purchased company entitled to severance where plan provides for such pay when jobs are "eliminated" and alternative employment is not available with original corporation), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). While some of these cases would provide some support had the Committee decided to grant 75/80 benefits, none indicate that the position the Committee in fact took was unreasonable