**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-4752

_____

ROBIN FEEKO; NELIDA MARENGO;
JANET RODGERS,
on behalf of themselves, individually, and
on behalf of all others, similarly situated,
Appellants

v.

PFIZER, INC.;
WYETH SPECIAL TRANSACTION SEVERANCE PLAN

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-04296)
District Judge:  Honorable Norma L. Shapiro

_____

Argued on November 18, 2015

Before:  AMBRO, HARDIMAN and SLOVITER *Circuit Judges.*

(Opinion filed:  January 6, 2016)

Monya M. Bunch, Esq.
Karen L. Handorf, Esq.     **(ARGUED)**
Cohen Milstein
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

Counsel for Appellants

Brandon L. Goodman, Esq.
Robert A. Limbacher, Esq.
Goodell DeVries Leech & Dann
2001 Market Street
Two Commerce Square, Suite 3700
Philadelphia, PA 19103

Albert L. Hogan, III, Esq.
Skadden, Arps, Slate, Meagher & Flom
155 North Wacker Drive
Suite 2700
Chicago, IL 60606

David R. Pehlke, Esq.        **(ARGUED)**
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

                  Counsel for Appellees

Mary E. Signorille, Esq.
AARP Foundation Litigation
601 E Street, N.W.
Washington, DC 20049

                  Counsel for Amicus Appellant AARP

—————————————

OPINION[*]

—————————————

SLOVITER, *Circuit Judge*.

Appellants Robin Feeko, Nelida Marengo, and Janet Rodgers brought claims for severance benefits under Pfizer's Severance Plan on behalf of themselves and the

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

proposed class pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically 29 U.S.C. § 1132(a)(1)(B). (App. at 303-09.) The District Court denied Appellants' motion for class certification on the ground that Appellants had not met the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1). (App. at 4.) It granted Appellees' motion for judgment on the administrative record or, in the alternative, for summary judgment, upholding Pfizer's determination that Appellants had not experienced a termination of employment as defined by the Severance Plan. (App. at 5, 28-29.) It concurrently denied Appellants' cross-motion for summary judgment and dismissed the case. (App. at 5.) Appellants Feeko, Marengo, and Rodgers appeal both orders. We will affirm the District Court's order granting judgment on the administrative record and decline to reach the class certification issue.

## I.

Because we write primarily for the benefit of the parties, we recount only the essential facts. In 2008, Wyeth, a pharmaceutical company, adopted the Special Transaction Severance Plan ("the Plan") in anticipation of a corporate takeover bid by Pfizer, Inc. (App. at 287, 314-15.) The purpose of the Plan was "to provide certain employees in the United States and Puerto Rico with benefits that will assist them with their transition during and following a Change in Control." App. at 41. An employee was eligible to receive severance benefits under the Plan "if, concurrently with or within the 24-month period following a Change in Control, the Employee has either (i) experienced an Involuntary Termination of Employment or (ii) resigned for Good Reason." App. at 45. Excluded from the definition of "Termination of Employment"

3

was any change in employment constituting a "transfer of employment to any successor company of the Company or (any of its affiliates)." App. at 44. The Plan documents do not define the phrase "successor company of the Company." They do, however, contain a provision titled "Binding on Successors," which states:

> The obligations of the Company under the Plan shall be binding upon any organization which shall succeed to all or substantially all of the assets of the Company or otherwise be a successor of the Company by operation of law and the term "Company," whenever used in the Plan, shall mean and include any such organization after the succession.

App. at 55.

The Plan specified that employees would be notified "at the time of Termination of Employment what benefits, if any, the Employee will receive under the Plan." App. at 46, 53. Employees who disagreed with the assessment were permitted to "submit a written request for review to the [Administrative Committee]," a body appointed by the senior vice president of human resources and comprised of employees at the senior director level or higher. (App. at 53, 589-590.) The Plan granted the Administrative Committee "full discretion to determine eligibility to receive benefits." App. at 46.

Appellants Feeko, Marengo, and Rodgers are former Wyeth employees.[1] (App. at 287, 315.) Benchmark Federal Credit Union ("Benchmark") is a company that provided credit services to Wyeth. (App. at 515.) The District Court found that Benchmark was a separate legal entity from Wyeth, and the parties do not dispute its finding. (App. at 18.)

---

[1] Appellant Feeko and Appellant Marengo began working at Wyeth in 1982 and 1983, respectively. (App. at 358, 369.) Appellant Rodgers worked at Wyeth from 1979 to 1989 and again starting in 1994. (App. at 373.)

4

During their entire tenure with Wyeth and then Pfizer ("the Company"), Appellants "worked in the Benchmark Federal Credit Union," but "were on the Pfizer payroll and participated in [the Company's] employee benefit plans." App. at 287, 315. It is unclear from the record exactly what Appellants' day-to-day job responsibilities were.

On October 15, 2009, Pfizer completed its purchase of Wyeth, thereby assuming responsibility over the Plan as its new sponsor.[2] (App. at 287, 289, 315, 317.) On or about March 10, Appellants participated in a teleconference with Pfizer Human Resources personnel and the CEO of Benchmark during which they were informed that as of April 1, 2010, they would be employed by Benchmark, not the Company. (App. at 295, 320.) Appellants were required to fill out a Benchmark employment application and benefit forms. (App. at 606-623.) In anticipation of these changes, Pfizer entered into an "Employee Continuity Agreement" ("the Agreement") with Benchmark, which provided that Appellants' employment would be transferred from Pfizer to Benchmark with no interruption in employment. (App. at 87.) The Agreement specified that each employee would be paid "a base rate of pay . . . that is at least equal to the last base rate of pay that such Transferring Employee earned as a Pfizer employee" and that the employees would continue to be covered by the Severance Plan.[3] App. at 88, 96-100. The Agreement also

---

[2] ERISA defines "plan sponsor" in relevant part as "the employer in the case of an employee benefit plan established or maintained by a single employer . . . or . . . in the case of a plan established or maintained by two or more employers or jointly by one or more employers . . . the parties who establish or maintain the plan." 29 U.S.C. § 1002 (2008).

[3] Employees were guaranteed the "last base rate of pay that such Transferring Employee[s] earned as a Pfizer employee." App. at 88. This guarantee lasted for "the

5

obligated Benchmark to provide certain benefits, including health and 401k (retirement) benefits. (App. at 88.) For purposes of benefits calculations, Appellants would be credited for service provided to Wyeth and Pfizer. (App. at 88.) The only change that Appellants have pointed to is that Benchmark did not continue their "Rule of 70" benefits[4] or contribute to their pension plans as the Company had done. (App. at 51.) On March 31, 2010, Pfizer terminated Appellants' employment; Benchmark hired them the next day. (App. at 287, 315.)

All three Appellants filed severance benefit claims within the designated filing period. (App. at 102-03, 148-49, 189-90.) They received a letter that their claims had been denied, stating:

> Your employment was transferred to a successor employer, Benchmark Federal Credit Union, effective April 1, 2010. You have not experienced an employment loss and have remained employed with Benchmark since that date of transfer. We understand that you have not experienced a reduction in your base rate of pay nor has your principle [sic] place of business been changed. As such, you have not experienced good cause for termination under the Plan.

App. at 106, 152, 193.

The denial letter apprised Appellants of their right to appeal the decision to the Administrative Committee, which they did. (App. at 112-14, 161-63, 198-200.) On appeal, the Committee denied their request, concluding:

---

period beginning with the effective date of transfer and ending on October 15, 2011." App. at 88.

[4] The parties explain, "The Rule of 70 benefit is an early retirement subsidy provided under the Wyeth Retirement Plan . . . that is available to an employee who meets the eligibility requirements of the Retirement Plan and the Severance Plan, and who has a combined age and years of vesting service equal to or in excess of 70." App. at 294, 319.

6

Benchmark is a successor to Pfizer with respect to the outsourcing of its credit union work and, under the terms of the Employment Continuity Agreement, maintained continuous employment for you with the same terms and conditions as you had at Pfizer. These terms and conditions include the same severance opportunity as you had under the Plan should your employment with Benchmark terminate within a two-year period. Therefore, the Committee finds that you did not experience a Termination of Employment under the Plan and are not entitled to severance benefits. This interpretation of the Plan's successor provision is consistent with Wyeth's past practices going back to Project Impact where Wyeth denied severance to employees transferred to another entity as a result of a sale if, like here, the entity to which employees were transferred provided services back to Wyeth.

App. at 139, 184, 222.

Appellants filed suit in the United States District Court for the Eastern District of Pennsylvania, raising a claim for severance benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). (App. at 286-310.) Appellants moved for class certification, which the Court denied. (App. at 6-16, 376-87.) Appellees filed a motion for judgment on the administrative record, and Appellants cross-filed a motion for summary judgment. (App. at 474-508, 541-75.) The District Court denied Appellants' motion and granted Appellees' motion for judgment on the administrative record. (App. at 28.) The District Court noted that the Continuity Agreement secured Appellants' employment at Benchmark; that their job responsibilities, work location, salaries, and benefits at Benchmark were the same as at Pfizer; and that a contrary interpretation would "have guaranteed plaintiffs a windfall." App. at 27-28. The Court concluded that, under the circumstances, it was not arbitrary and capricious for the Administrative Committee to conclude that Benchmark was a successor company of the Company insofar as Appellants' employment was concerned.

7

II.

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291 because Appellants Feeko, Marengo, and Rodgers appeal a final decision of the District Court. "We review a district court's grant of summary judgment *de novo*, applying the same standard the district court applied." *Viera v. Life Ins. Co. of North Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citation omitted). Appellants raise two issues on appeal. First, they argue that the District Court did not give enough weight to a number of procedural irregularities in the Committee's decision and to several Committee members' conflicts of interest. Second, they argue that the Committee's decision was arbitrary and capricious. We address both issues.

A.

When a plan administrator faces a conflict of interest in deciding whether to disburse benefits, courts should "consider [the conflict] as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)). The weight given to such a conflict depends on a number of factors, "including, but not limited to . . . [whether] an . . . administrator has a history of biased claims administration" and whether "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or

8

by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117 (citations omitted).

Here, the District Court found several "inherent conflicts of interest." App. at 25. First, the Administrative Committee was comprised of senior-level Pfizer employees who had a financial incentive to deny benefit claims to reduce company expenses. (App. at 25.) Moreover, the Court noted that three of the Committee members were involved in negotiating the Continuity Agreement, thereby predisposing them to deny benefits in order to protect the Agreement's integrity. (App. at 25.) The District Court stated, "[t]he three members who helped negotiate the Continuity Agreement had significant incentive to have their interpretation of the Severance Plan upheld." App. at 25. Although the Committee disclosed these conflicts, they ultimately decided against recusal, declaring that they had acted as Pfizer executives at the time but were acting as Plan fiduciaries when hearing benefits appeals. (App. at 24-25.) Pfizer took no steps to mitigate these conflicts. (App. at 25.)

The District Court concluded, "the Committee's structural conflicts of interest remain troubling but not determinative." App. at 29. Appellants claim that the District Court afforded the conflicts improper weight. We disagree. Conflicts of interest are merely one factor to be considered in determining the reasonableness of the Plan Administrator's decision. *Glenn*, 554 U.S. at 117 ("Any one factor will act as a tiebreaker when the other factors are closely balanced."). While we recognize that the Committee was comprised of upper-level Pfizer employees who participated in negotiating the Continuity Agreement, we believe the District Court properly considered

and factored each conflict of interest into its decision. Although conflicts play a role in determining the reasonableness of the denial of benefits, the ultimate question is whether the Committee's interpretation of the Plan itself was reasonable. As further explained below, we find that it was.

B.

We turn our attention to the Administrative Committee's decision. A plan administrator's decision to deny benefits must be grounded in the plain language of the plan. *Epright v. Envtl. Res. Mgmt., Inc., Health and Welfare Plan*, 81 F.3d 335, 339 (3d Cir. 1996) (citation omitted) ("A Plan Administrator['s] . . . interpretation may not controvert the plain language of the document."). If a plan grants its administrator discretion to "determine eligibility for benefits or to construe the terms of the plan," we review the administrator's decision under the arbitrary and capricious standard. *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120-21 (3d Cir. 2012) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "When a plan's language is ambiguous and the administrator is authorized to interpret it, courts must defer to this interpretation unless it is arbitrary or capricious." *Id.* (internal quotations omitted). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991) (citation omitted). Whether a plan term is ambiguous is a question of law we review de novo. *In re Unisys Corp. Long Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir. 1996).

We agree with the District Court that the phrase "successor company of the Company or (any of its affiliates)" is ambiguous. The term "successor" is not defined in the Plan, and it is susceptible to more than one meaning. *Id.* at 1234 (finding term "successor" to be ambiguous); *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 262 n.9 (1974) (holding that context determines meaning of "successor"). Appellants disagree and point to Article VIII, § 8.3 of the Plan, titled "Binding on Successors." App. at 55. It states:

> The obligations of the Company under the Plan shall be binding upon any organization which shall succeed to all or substantially all of the assets of the Company or otherwise be a successor of the Company by operation of law and the term "Company," whenever used in the Plan, shall mean and include any such organization after the succession.

App. at 55.

It is clear from the language of § 8.3, however, that it does not define "successor company of the Company or (any of its affiliates)." Rather, § 8.3 governs the effect of a change in ownership of the Company on the continuity of the Plan.

Having found the Plan language ambiguous, we note that the Plan grants its administrator "full discretion to determine eligibility to receive benefits." App. at 46. Therefore, we review the Administrative Committee's decision under the arbitrary and capricious standard.[5]  *Orvosh v. Program of Group Ins. for Salaried Emps. of*

---

[5] "We have described the deferential standard of review that we use in the ERISA context as both an arbitrary and capricious standard of review, and a review for abuse of

*Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000) (standard of review depends on discretion afforded plan administrator). The following factors are used to analyze the reasonableness of a plan administrator's interpretation of plan:

> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 795 (3d Cir. 2010) (alterations in original) (citation omitted).

The Administrative Committee denied Appellants' claim for benefits on the ground that Benchmark was a successor company of the Company. Appellants argue that Benchmark was not a successor. We disagree. The Committee's interpretation appears to be consistent with the goals of the Plan, "to provide certain employees . . . with benefits that will assist them with their transition during and following a Change in Control." App. at 41. Appellants' transition was relatively smooth. Although Pfizer has not contested that they were transferred from its employ to Benchmark, their responsibilities were the same, the physical location of their office remained the same, their salary and benefits remained largely unchanged, and there was no temporal gap in their employment. It would seem that the purpose of the Plan was to help employees who experience unemployment as a result of the change in control of Wyeth. That

---

discretion." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010) (internal quotation marks omitted).

purpose would not have been served by granting Appellants' claim for benefits. Not only were Appellants immediately employed, they experienced practically no change during the transition. Conversely, had the Company granted Appellants' request for severance benefits, they would have received severance benefits on top of the salary and benefits they were receiving from Benchmark. Such a scenario would appear to contradict, not conform to, the goals of the Plan.

None of the remaining factors cited by *Howley* demonstrate that the Committee's ruling was arbitrary or capricious. There is no language in the Plan that is rendered meaningless or internally inconsistent by the Committee's interpretation of "successor." Similarly, there is no clear plan language that conflicts with the Committee's decision. As we have already noted, the term "successor" is ambiguous because there is nothing in the Plan that can be read as a definition of that term. Moreover, it does not appear that ERISA itself conflicts with the Committee's decision.

Finally, Appellants point out several procedural irregularities in the Committee's decision. The District Court found that the Committee incorrectly stated that "Wyeth's on-site credit union" was "sold to [Benchmark]" and that Appellants were "transferred to Benchmark as part of the sale." App. at 23 (alteration in original). In finding Appellants ineligible for benefits, the Committee noted that Benchmark was a "successor employer" and utilized the "same desk" rule. App. at 285. Neither of these terms appears in the Severance Plan. Although the Plan refers to "successor company," there is no reference to "successor employer." Finally, the Committee cited to past Wyeth benefits decisions regarding other plans and noted that its decision was "reasonable" and "consistent" with

13

those decisions and Wyeth's past practices. App. at 285. The Plan itself does not specify whether Plan Administrators may consult past decisions.

Procedural irregularities factor into the court's review of an administrator's decision insofar as they demonstrate a "reason to doubt its fiduciary neutrality." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 165 (3d Cir. 2007)). While the Committee cited several incorrect facts and used terminology not contained in the language of the Plan, these irregularities suggest harmless factual error as opposed to fundamental impropriety that calls into doubt the fiduciary neutrality of the Committee. As for the Committee's reference to past benefits decisions, we do not believe such a practice is inappropriate so long as the Committee's interpretation was reasonable and the focus of its inquiry was on the language of the Plan. That appears to be the case here.

In closing, we note that Appellants raise an alternative interpretation of "successor company of the Company or (any of its affiliates)" that may very well be a reasonable interpretation of the Plan's language. The relevant inquiry, however, is whether the Committee's interpretation of the Plan was reasonable, regardless of whether we agree with it. We find that it was.

For the reasons set forth, we will affirm the Order of the District Court.

14

Robin Feeko, et al. v. Pfizer, Inc., et al.
No. 14-4752

_____

AMBRO, Circuit Judge, dissenting

We must give a conflict of interest "greater importance, *perhaps determinative importance*, where the evidence suggests a greater likelihood that it affected the decision to deny benefits." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 794 (3d Cir. 2010) (emphasis added). In this case, three of the five members of Pfizer's Administrative Committee came to the table with a conflict that prevented them from neutrally deciding the benefits claims. My colleagues nonetheless bless the Committee's decision. Because I believe there was a debilitating conflict whose influence is apparent in a series of procedural and substantive missteps in the Committee's deliberations, I respectfully dissent.

The question before the Administrative Committee was whether Benchmark was a successor company to Pfizer. If Benchmark was, then Appellants are not entitled to severance benefits; if it was not, then Appellants win. ERISA demands a neutral resolution to that question. But for three members of the Committee, which operates by majority vote, the result was a foregone conclusion. That is because, as the District Court noted, several months before Appellants filed their claims, these members were "personally involved" in the decision to take Appellants off Pfizer's payroll and put them on Benchmark's. *Feeko v. Pfizer, Inc.*, Civ. Action No. 11-4296, 2014 WL 6473265, at *5 (E.D. Pa. Nov. 18, 2014). During that process, the three members, acting in their

business rather than fiduciary capacities, structured the deal with an intent to assure that Benchmark would be a successor company to Pfizer. *Id.* at \*6. They did so under the belief that, as a result of this structure, severance payments would be "precluded." *Id.* Indeed, during the meeting when the Committee considered Appellants' claims, these members conceded that they had already been part of a decision that Appellants "would not be eligible for severance." App. at 285 (Committee minutes). And though they disclosed this, the Committee made no effort to mitigate the conflict. *Feeko*, 2014 WL 6473265, at \*6. Pfizer now asks us to consider these members to be neutral arbiters on a question whose answer they had already decided. That asks too much.

The District Court acknowledged the severity of this conflict. The three members, it noted, had "significant incentive" to deny Appellants' benefits claims. *Id.* In other words, they "would have been influenced to reach the same conclusion" in their fiduciary capacities as they did in their business capacities. *Id.* They might "seek to avoid contradicting their own interpretations so quickly; they would have significant reason to avoid subjecting Pfizer to liability for severance benefits when they had participated in drafting or approving language they believed precluded such liability." *Id.*

Yet the District Court concluded, and the majority here agrees, that these conflicts, while substantial, can be overlooked. But this approach does little more than pay lip service to conflicts as a factor in evaluating a plan administrator's decisions. The logical conclusion from the District Court's opinion is that the conflict bore heavily on the Committee's decision-making process. The conflict therefore undermined the neutrality that the Committee was supposed to have.

2

Perhaps Pfizer could have overcome all of this if the other evidence clearly supported its position. Instead, the opposite is true. The administrative record is so littered with pitfalls that it only supports, rather than rebuts, the notion that a conflict of interest improperly intruded on the Administrative Committee's deliberations. As my colleagues acknowledge, the Committee based its interpretation on terminology found nowhere in the severance plan, mistakenly described the nature of the transaction between Pfizer and Benchmark (calling it a "sale" even though nothing was sold), and supported its determination using past practices that arose under entirely different factual situations. Maj. Op. at 12–13.

And most importantly—and here my view differs substantially from that of the majority—the Committee labeled Benchmark a "successor company" to Pfizer under circumstances that defy the common meaning of the term. The majority is correct that "successor company of the Company" can mean a number of things. *See, e.g.*, *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 257 (1974) (noting that "mergers, consolidations, or purchases of assets" can, under the right circumstances, lead to successorship). But here the question is not what it can mean, but rather what it cannot mean. We might, for instance, reasonably debate whether a transfer of a small percentage of assets creates successorship. But under our facts, there are none of the minimal indicia of successorship—no consolidation, no merger, no purchase of assets. The only attempt that Pfizer makes to justify its interpretation as a matter of common usage is that "Benchmark qualified as a successor company of Pfizer with respect to the provision of credit union services." *Feeko*, 2014 WL 6473265, at *8. But that does not do the trick

3

because Benchmark was already providing these services for Pfizer well before Appellants became Benchmark employees.

Benchmark concededly succeeded to Pfizer in the employment of Appellants, but that makes Benchmark the successor *employer* of Appellants. It does not make Benchmark a successor *company* to Pfizer, which is the relevant inquiry under the severance plan. Imagine that Pfizer, desiring healthy meal options for its employees, opens a McDonald's on its campus and decides that it will staff the restaurant with Pfizer employees so that it can more effectively manage their performance. Growing tired of the arrangement, Pfizer transfers the employees to McDonald's. There is no logical way to view McDonald's in this scenario as a successor company to Pfizer. For the same reasons, Benchmark did not, in any normal usage of the term, become a successor company to Pfizer.

The majority's other principal argument—that the Committee's construction is consistent with the purpose of the severance plan because Appellants are not what comes to mind when one thinks of severed employees—no doubt has surface appeal, but I am unconvinced. At the outset, Pfizer's own actions—in sending Appellants a letter saying they had experienced a "termination of employment" and in providing them with a question-and-answer document saying that a period of unemployment was not a prerequisite to receiving salary continuation benefits—rebut this. *See, e.g.*, App. at 203, 625. Additionally, given that Appellants have lost certain Pfizer benefits (such as pension plan contributions and free prescriptions) now that they work for Benchmark, our own case law supports the conclusion that there is nothing incongruous about treating them as

4

severed employees with all the severance rights accorded that status. *See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1171 (3d Cir. 1992) (noting that severance payments can offset a reduction in benefits even when "employment continues without interruption with a new employer").

So we are back to where we started. Under *Howley*, a conflict can be "determinative" of our outcome if it bears sufficiently on the decision of a plan administrator. 625 F.3d at 794. If we are not willing to give determinative effect here—where we have an interpretation at odds with the key term's common meaning, various procedural errors, and a conflict that provided, in the District Court's own words, a "significant incentive" to deny Appellants' claims—I cannot see how we can ever factor conflicts meaningfully into our analysis. As a result, I would reverse the District Court and grant summary judgment to Appellants.[1]

---

[1] Because the majority upholds the grant of judgment to Pfizer, it does not need to address the District Court's separate order denying class certification on the ground that the class was not sufficiently numerous. Given my view that Appellants are entitled to judgment, I would need to review the certification order. It rested on the belief that unnamed class members who have missed the deadline to exhaust their administrative remedies cannot, as a matter of law, count toward the numerosity requirement. I would hold that the District Court erred in this determination. The overwhelming consensus among other courts to consider the question in the ERISA context is that exhaustion by unnamed class members is not necessary where the named plaintiffs have exhausted their administrative remedies. *See, e.g.*, *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 n.5 (10th Cir. 2007); *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 501–02 (7th Cir. 2006); *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 395 (E.D. Pa. 2001). Although exhaustion by unnamed class members is not required, the District Court still has discretion to determine whether to count unnamed members who did not exhaust toward the numerosity requirement. In exercising its discretion here, the District Court would have needed to consider whether counting the unnamed members would defeat the purposes that the exhaustion requirement typically serves: providing notice to the defendant of the nature of the claims

prior to litigation and allowing an opportunity for internal resolution. Relevant factors include whether the unnamed members' claims are "very similar to those" Pfizer already rejected administratively (such that Pfizer, even without exhaustion, had notice) and whether requiring exhaustion "would merely produce an avalanche of duplicative proceedings and accidental forfeitures." *In re Household Int'l Tax Reduction Plan*, 441 F.3d at 501–02. If the District Court, in exercising its discretion, had counted the unnamed members and found that the class was sufficiently numerous, it would then have needed to determine whether any other reasons precluded class certification.