**Joan PUGH, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY and the Metrahealth Companies, Inc., Defendants.**

**Civil Action No. 96–104MMS.**

United States District Court, D. Delaware.

June 10, 1997.

Michael R. Ippoliti of Becker & Ippoliti, P.A., Wilmington, DE (Robert J. Birch of Mesirov, Gelman, Jaffee, Cramer & Jamieson, Philadelphia, PA, of counsel), for Joan Pugh.

Paul A. Bradley of McCarter & English, Wilmington, DE, for Defendant Metropolitan Life Insurance Company.

David H. Williams of Morris, James, Hitchens & Williams, Wilmington, DE, for Defendant Metrahealth Companies, Inc.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

Plaintiff Joan Pugh ("Pugh") filed suit against two of her former employers, Metropolitan Life Insurance Co. ("Metlife") and the Metrahealth Co., Inc. ("Metrahealth"), alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § *1001 et seq.* and state law in connection with her severance pay. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132. Both Metlife and Metra-

health have filed motions for summary judgment. For the reasons that follow, their motions will be granted.

## II. FACTUAL BACKGROUND

Pugh worked for Metlife in Utica, New York from 1969 until her job was eliminated on September 30, 1993. Docket Item ("D.I.") 60 at 35. Pursuant to Metlife's Separation Allowance Plan ("Separation Plan"), an unfunded benefit plan paid out of the general assets of Metlife, *see id,* at 5, Pugh received a severance payment, sometimes called a "separation payment," of $40,769.23. *Id.* at 36.

Pugh began another position with Metlife three months later, in January of 1994, also in Utica. In May of 1994, Pugh was contacted about a new position in Delaware by Metrahealth, a joint venture between Metlife and Traveler's Insurance Co. Pugh interviewed with Charles Sampson and Janet Vaughn about the new position; she alleges she told Sampson she wanted her Metrahealth "anniversary date"—a term used to describe an employee's starting date with a company and which affects the myriad benefits to which the employee is entitled—to relate back to 1969, the year Pugh began working for Metlife. D.I. 60 at 81–82. Pugh made this demand, she states, "because [she] wanted to ensure that [she] had all the Metropolitan benefits." D.I. 60 at 82. Employees at Metrahealth were covered by the Metlife benefits program, and Pugh wanted assurance she would be entitled to the same benefits Metlife provides to its other employees. *Id.* at 58–59. Sampson allegedly responded "[t]hat it would be no problem, that it is not an issue." *Id.* at 82. Her doubts about her anniversary date settled, Pugh accepted the job offer from Metrahealth. Metrahealth, through Sampson, sent a confirmatory letter dated April 25, 1994, which described Pugh's job move as a "transfer" and alerted Pugh her "adjusted corporate anniversary date" was November 11, 1969. *Id.* at 25. Pugh moved to Delaware and began working for Metrahealth on May 16, 1994.

Pugh did not last long at Metrahealth; her position was eliminated effective May 16, 1995. *Id.* at 26. She was given another lump sum severance payment from Metlife, this time $4,284.60. *Id.* Pursuant to the Plan, Metlife calculated Pugh's severance payment from her 1994 rehire because she had already received a severance payment based on her Metlife service from 1969 until 1993. *Id.*

The amount of her severance pay distressed Pugh; apparently expecting a munificence, based on twenty-six years of service dating from 1969, she received a pittance. Pugh contacted Nancy Henlotter, the director of Human Resources at Metlife, to communicate her displeasure. According to Pugh, Henlotter agreed Pugh had not been given an accurate severance payment and suggested Pugh should send her a memo. *Id.* at 66–67. Henlotter remembers the conversation quite differently; she states she told Pugh she needed to "research the situation" before she could give Pugh a definitive response. *Id.* at 34. In any event, Henlotter denied Pugh's request for an increase in her severance pay. Pugh had already received a severance payment for her service from 1969 until 1993, Henlotter explained, and the Separation Plan allowed her a second one only based on the date of her rehire in 1994. *Id.*

Pugh greeted this reasoning with a lawsuit. Count I alleges Metlife failed to adhere to its Separation Plan and breached its contract with Pugh by ignoring Pugh's years of service from 1969 to 1993 in calculating her severance payment. D.I. 17 at 5–6, paragraphs ("¶¶") 21–24. In Count I, Pugh invokes 29 U.S.C. § 1132(a)(1)(B), which allows participants of certain employee benefit plans to bring a civil action for alleged violations of ERISA. D.I. 17 at 5, ¶ 20. Count II alleges Metlife violated DEL.CODE tit. 19, § 1109(a) by promising Pugh she would be given credit for her service with Metlife dating back to 1969, then failing to base her severance pay on that service. *Id.* at 6–7, ¶¶ 25–30. Count III alleges Metlife should be equitably estopped from claiming the Separation Plan precludes awarding Pugh severance pay based upon her service from 1969 until 1993. *Id.* at 8, ¶ 37. Metlife and Metrahealth have moved for summary judgment on all counts.

## III. DISCUSSION

### A. Summary Judgment Standards

Metlife and Metrahealth have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Where there is a dispute, the non-moving party must place in the record sufficient evidence for the Court to find a genuine issue of material fact.

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, the evidence of record is viewed in a light most favorable to the nonmovant. *Knabe v. The Boury Corp*, 114 F.3d 407, 408–09 (3d Cir.1997). With these principles in mind, the Court turns to the mettle of Pugh's allegations.

### B. Count I–Recovery of Benefits under ERISA

As a participant to a plan covered by ERISA, Pugh asserts a private right of action, *see* 29 U.S.C. § 1132(a)(1)(B); she claims Metlife [1] ignored the terms of its Separation Plan and failed to pay Pugh "the full severance to which she is entitled." D.I. 17 at 6, ¶ 23. Instead of receiving a mere $4,284.62 based on four weeks of severance pay, Pugh argues she should receive $42,807 based on forty-nine weeks of severance pay.[2] D.I. 17 at 5, ¶¶ 21–22.

#### 1. Standard of Review

ERISA does not set out the standard of review for an action brought under § 1132(a)(1)(B) by a participant alleging she has been denied benefits to which she is entitled under a covered plan. But in *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court held "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). If the administrator is accorded discretionary authority under the plan, the administrator's decision will only be disturbed if unreasonable. *Id.* at 111, 109 S.Ct. at 954–55; *see also Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437–38 (3d Cir.1997).

There can be no question the administrator is afforded discretionary authority under Metlife's Separation Plan. The Separation Plan states Metlife "shall have full and complete discretion to interpret and construe all Plan provisions, and such interpretation shall be final and binding on all Employees." D.I. 60 at 10, § 6.4. Accordingly, the Court applies an "arbitrary and capricious" standard; that is, the Court can overturn a decision of the Separation Plan administrator—in this case, Metlife—only if the decision is "without reason, unsupported by the evidence or erroneous as a matter of law." *Mitchell*, 113 F.3d at 435 (quoting

---

**1.** Pugh levels the same allegations against Metlife and Metrahealth. Accordingly, the Court refers to Metlife throughout much of the remainder of this opinion with the understanding this reference also includes Metrahealth by implication. The Court distinguishes between the Metlife and Metrahealth when the separate identities of the two entities is material.

**2.** *See infra* note 6 for the schedule by which Metlife calculated severance payments.

*Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491, 500 (W.D.Pa.1989)).

■ Both the Supreme Court and Third Circuit Court of Appeals have noted "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 111, 109 S.Ct. at 954 (quoting RESTATEMENT (SECOND) OF TRUSTS, § 187, comment d (1959)); *Mitchell,* 113 F.3d at 437 n. 4 (quoting Firestone); *Epright v. Environmental Resources Management, Inc., Health & Welfare Plan,* 81 F.3d 335, 340 (3d Cir. 1996); *Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1172 (3d Cir.1992). Metlife's Separation Plan is unfunded and paid out of the general assets of Metlife; put bluntly, every time Metlife makes a severance payment, it does so to the detriment of its coffers. Although Pugh does not argue it, the Third Circuit Court of Appeals has recognized a conflict of interest in similar circumstances. *See Kotrosits,* 970 F.2d at 1173 (citing *Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134, 137–38 (3d Cir.1987), *aff'd in part, rev'd in part,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Accordingly, the Court has weighed Metlife's apparent conflict of interest in determining whether refusing Pugh benefits under the terms of the Separation Plan was "arbitrary and capricious" or "an abuse of discretion." *See Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995) (noting the existence of an alleged conflict of interest does not operate to change the standard of review, but rather becomes a "facto[r] in determining whether there is an abuse of discretion.") (quoting *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957); *Darling v. E.I. DuPont de Nemours & Co.,* 952 F.Supp. 162, 164–65 (W.D.N.Y. 1997).

### 2. The Separation Plan

■ Metlife cites Section 1.4.09 of the Separation Plan as reason for its refusal to pay Pugh a second separation allowance based on her service from 1969 until 1993. Section 1.4.09 states:

> (a) *In the event that a Separation [A]llowance was previously paid to an employee by [Metlife Metrahealth], completed years of employment will be computed from the date the Employee was first reemployed by [Metlife or Metrahealth] after the cessation of employment for which the prior Separation Allowance payment was made. For purposes of the break in service rules set forth in the MetLife Options Plus Summary Plan Description book, in no event shall any Service of an Employee that was rendered prior to the cessation of employment for which a prior Separation allowance payment was made be counted.*

D.I. 50 at 4, § 1.4.09 (emphasis added). In 1993, Pugh received a separation allowance of approximately $41,000 for her service with Metlife from 1969. Pugh now seeks a second separation allowance based on those same years of service. Section 1.4.09 quite explicitly forbids this; it prevents an employee from receiving a windfall by receiving two separation allowances for the same period of service.

Pugh tries to avoid this springe with several arguments, none of which are availing. First, Pugh argues Section 1.4.09 does not apply because her employment with Metlife did not "cease" as required by section 1.4.09—she was simply transferred to Metrahealth.[3] As support for this, Pugh points to the letter she received from Metrahealth on April 25, 1994 which stated "[t]he effective date of your *transfer* is May 1st." D.I. 50 at 17 (emphasis added). The short answer is this does not refer to either the employment action or time period that is relevant for Section 1.4.09. There is no dispute Pugh's position was eliminated in September of 1993, when she was first paid a separation allowance; Pugh was rehired in January of 1994 only after she was terminated, of course, then she was transferred to Metrahealth.

---

3. Remember, section 1.4.09(a) provides "[i]n the event that a Separation allowance was previously paid to an employee ..., completed years of employment will be computed from the date the Employee was *first reemployed ... after the cessation of employment* for which the prior Separation Allowance was made." D.I. 50 at 3–4 (emphasis added).

Indeed, Pugh seems to acknowledge this. She chides Metlife for overlooking the fact she was "excessed" under Metlife's Excess Employee Policy. The term "excessed" is a delicate euphemism for being terminated and the Separation Plan states that "Discontinuance of Employment under the Provisions of the Company's Excess Employee Policy means the *involuntary cessation* of an Employee's employment due to expense reduction considerations, office closings, or because of technological, procedural or organizational changes." D.I. 50 at 2, § 1.4.06. Pugh concedes—indeed, insists—she was "excessed" because her job was eliminated in 1995, yet she left Metlife for the same reasons in 1993. D.I. 60 at 36–37. According to the Separation Plan, not to mention common sense,[4] an employee who has been "excessed"—whether in 1993 or in 1995—has involuntarily ceased employment. Thus, Pugh's argument Section 1.4.09 does not apply because her employment did not cease and she was merely "transferred" is without merit.

As noted earlier, Pugh chastises Metlife for overlooking the fact she was "excessed" in 1995. Pugh chides Metlife for this because, Pugh argues, Metlife did not abide by its written guidelines for granting separation allowances to "excessed" employees. Section 4.2 states "[i]f an Employee's employment with [Metlife or Metrahealth] is involuntarily discontinued as a result of a Discontinuance of Employment under the Provisions of [Metlife or Metrahealth]'s Excess Employee Policy, [either Metlife or Metrahealth] may, in its discretion, grant a Separation Allowance Payment to such Employee in accordance with" a payment schedule.[5] D.I. 50 at 7. Section 4.2 further provides either Metlife or Metrahealth:

may, in its discretion, pay an additional amount beyond that shown above taking all pertinent facts and circumstances into consideration. [Either Metlife or Metrahealth] may, in its discretion, grant lesser amounts than those shown above. [Metlife or Metrahealth] will determine, on a case-by-case basis, whether an Employee is entitled to an additional, a reduced, or no Separation Allowance Payment.

*Id.* Pugh also points to two other policy statements promulgated by Metlife. One outlines in general terms the separation benefits employees are entitled to when "excessed." The policy further states Metlife will "ensure equitable and consistent treatment of employees whose positions become excess to their organization's staffing needs." D.I. 60 at 23. The second policy statement explains when an employee has no break in service, or when her break in service lasts only for a short time, then her first day of employment will be considered the corporate anniversary date. D.I. 60 at 41–42.

Pugh's quarrel is with Metlife's alleged failure to follow Section 4.2 or the policy statements by considering all the "pertinent facts and circumstances" which, according to Pugh, would have entitled her to a second separation allowance based on her employment from 1969 to 1993. Specifically, Pugh argues Metlife did not consider the April 25, 1994 letter which allegedly readjusted Pugh's corporate anniversary date. This is a squabble Pugh cannot win, for two main reasons.

First, from all appearances, Metlife did consider the "pertinent facts and circumstances," which included the clear prohibition against employee "double-dipping" found in Section 1.4.09. The Court cannot fault Metlife for following the clear dictates of its own policy. Second, the Separation Policy affords

---

4. The Court assumes Metlife would not have given Pugh a separation payment had she been merely transferred rather than "excessed."

5. The table sets forth the following payment schedule:

| Years of Service | Equivalent Weeks' Salary |
| --- | --- |
| Less than 4 | 4 |
| 4 but less than 5 | 5 |
| 5 but less than 6 | 6 |
| 6 but less than 7 | 7 |
| 7 but less than 8 | 8 |
| 8 but less than 9 | 9 |
| 9 but less than 10 | 10 |
| 10 but less than 30 | 12 plus 2 weeks for each full year of service in excess of 10 years |
| 30 or more | 52 |

D.I. 50 at 7.

Metlife substantial discretion in determining severance payments. The Third Circuit Court of Appeals has repeatedly cautioned the district courts they are "not free to substitute [their] own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell,* 113 F.3d at 435 (quoting *Lucash v. Strick Corp.,* 602 F.Supp. 430, 434 (E.D.Pa.1984), *aff'd mem.,* 760 F.2d 259 (3d Cir.1985)); *see also Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993) (also quoting *Lucash* ). Metlife's conclusion that Pugh was not eligible for a duplicate severance payment is eminently reasonable; even considering Metlife's apparent conflict of interest, the Court is not inclined to set this decision aside.

At its most elemental, Pugh's contention in Count I is that she deserves a separation payment dating back her first days at Metlife. Under the terms of the Separation Plan, however, Metlife was not obligated to agree. Nor is the Court. Accordingly, summary judgment will be granted as to Count I of Pugh's complaint.

### C. Count I–Equitable Estoppel

██ In Count III, Pugh argues Metlife should be estopped from denying Pugh a second separation payment in 1995 based on her service from 1969 until 1993. An employer can be held liable under ERISA for affirmative misrepresentations on an equitable estoppel theory. 29 U.S.C. § 1132(a)(3)(B); *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 235 (3d Cir.1994). Pugh must establish three elements to succeed on her claim of equitable estoppel: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances. *In re New Valley Corp.,* 89 F.3d 143, 153 (3d Cir.1996), cert. *denied,* ––– U.S. ––––, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997).

██ Pugh bases her estoppel claim on three events: (1) the conversation she had with Sampson and Vaughn before she accepted the job with Metrahealth, (2) the subsequent confirmatory letter she received from Sampson, and (3) the dialogue she had with Henlotter after she was terminated in 1995.

As for the first requirement of an estoppel claim, that of a material representation, there is no evidence any representative of Metlife specifically told Pugh she would receive a second separation payment for the time span of 1969 to 1993. In fact, the conversation with Sampson and Vaughn and the subsequent confirmation letter from Sampson merely touched upon Pugh's corporate anniversary date—a date which would affect her vacation, retirement benefits, life insurance and savings investment, benefits about which, the Court observes, Pugh seems to have no complaint. D.I. 50 at 65–66. In short, there was no discussion regarding how Pugh's anniversary date might affect her separation payment. D.I. 50 at 65–66, 71. The record is devoid of any evidence either Vaughn or Sampson told Pugh her separation payment would be based on her years of service from 1969 to 1993, for which she already received remuneration. Pugh may have assumed she would receive a second separation payment which would approximate the separation payment she had already received, but neither Sampson nor Vaughn made any misrepresentation that would have spawned such an assumption. *See Henry v. Black & Decker Inc.,* 779 F.Supp. 778, 787 (D.N.J.1991) ( holding defendant sponsor of employee benefit plans made no representation where plaintiff believed he would receive benefits because similarly situated coworker received them and sponsor "never specifically told plaintiff that he would receive a benefit for which he was not eligible.").

Pugh alleges she complained about her 1995 separation payment to Henlotter and Henlotter agreed her payment should have been calculated to include the years of 1969 to 1993. At this procedural stage, the Court must assume this is true. *Knabe,* 114 F.3d at 408–09. Even if this is true, however, and even if this Henlotter's acquiescence can somehow be construed as an affirmative representation, it is immaterial to Pugh's estoppel claim. Pugh complained to Henlotter *after* she was "excessed," after all; the acts Pugh alleges she undertook in reliance upon a sizable separation payment, i.e., accepting

the position and moving to Delaware, occurred long before she spoke with Henlotter.

It follows that Pugh has also failed to meet the second requirement: without a material misrepresentation there can be no reasonable and detrimental reliance. Based on the general statements by Vaughn and Sampson, a factfinder could not conclude it would be reasonable for Pugh to believe she would receive two separation payments covering the same years, let alone rely on such a belief.

Finally, Pugh has no evidence regarding the third element to equitable estoppel claims under ERISA: extraordinary circumstances. The Third Circuit Court of Appeals has never explicitly defined "extraordinary circumstances," relying instead on case law to delineate its contours. *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996). To support a showing of "extraordinary circumstances", the Third Circuit Court of Appeals has "required a showing of affirmative acts of fraud or similarly inequitable conduct by an employer" *Id.* (citing *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 n. 10 (3d Cir.1990); *Rosen v. Hotel & Restaurant Employees & Bartenders Union*, 637 F.2d 592, 598 (3d Cir.1981)).[6] At other times, the appellate court has looked for "the network of misrepresentations that arise over an extended course of dealing between parties." *Id.* (citing *Curcio*, 33 F.3d at 238; *Smith v. Hartford Ins. Group*, 6 F.3d 131, 142 (3d Cir.1993)). Finally, an especially vulnerable plaintiff may succeed in persuading the court to allow a finding of "extraordinary circumstances." *Id.*; *Curcio*, 33 F.3d at 238 (holding reasonable fact finder could find extraordinary circumstances when widow was emphatically reassured—to point of encouraging her to sue insurer—by husband's employer she was entitled to coverage of accidental death of husband, then employer

withdrew coverage); *Smith*, 6 F.3d at 142 (holding reasonable fact finder could find extraordinary circumstances when plaintiff was repeatedly told by employer she would receive same coverage under new plan for skilled nursing required as a result of cerebral hemorrhage as she had received under old plan).

Pugh presents none of the three scenarios identified as "extraordinary" by the Third Circuit Court of Appeals. First, she has failed to present any evidence of affirmative acts of fraud or other inequitable conduct; at most, she has shown she has misconstrued a series of statements made by Metlife relating to her corporate anniversary date. Second, there is no evidence Metlife wove a web of misrepresentations over an extended course of dealing; again, at most, Pugh can adduce a meeting and a confirmatory letter to support her claim of estoppel. Finally, Pugh is far from vulnerable. There is no evidence Metrahealth unduly pressured Pugh to accept a position at Metlife and accede to the terms of the Separation Plan. She has already received a separation payment based on her years of service from 1969 to 1993. The only aspect of her case that can fairly be described as "extraordinary" is her demand: she is seeking what is essentially double payment for those years. No other Metlife or Metrahealth employee is entitled to this under the Separation Plan.

Accordingly, the Court concludes Pugh has not shown any evidence from which a reasonable factfinder could find Metlife liable under an equitable estoppel theory. Absent such a showing, her claim cannot survive summary judgment.

### D.  Count II—Violation of Delaware Law

Pugh has alleged a cause of action under DEL.CODE tit. 19, § 1109(a). This provision

---

6.  The prototypical case of "extraordinary circumstances," and the case most often cited by courts in the Third Circuit as an example of the proposition in equitable estoppel claims under ERISA, is *Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592. In *Rosen*, the defendant trustee of a pension fund denied Rosen's application because he lacked the fifteen years of credited service. *Id.* at 594. When advised by the trustee his pension was in jeopardy due to his employer's failure to contribute to the fund, Rosen wrote a check to cover his employer's arrearages. *Id.* at 597. The trustee deposited the money into the account without comment, then asserted Rosen was not entitled to credited service under the plan. *Id.* The Third Circuit held the trustee's acceptance of Rosen's check on behalf of the fund estopped the trustee from asserted this defense. *Id.*

is entitled "Benefits and wage supplements" and provides:

> Any employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made; provided, however, that this section shall not apply to employers subject to Part I of the Interstate Commerce Act [49 U.S.C. § 1, *et. seq.*]

█ Separation pay is included in the definition of "benefits" for purposes of this section. DEL. CODE tit. 19, § 1109(b). Metlife has raised the shield of ERISA preemption against Pugh's Delaware statutory claim and Count III, to the extent it can be interpreted to allege a state-law estoppel claim.

ERISA is quite plain. If a state law "relate[s] to ... employee benefit plan[s]," it is preempted. 29 U.S.C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987). The Supreme Court has observed the "express preemption provisions of ERISA are deliberately expansive, and designed to 'establish [employee benefit] plan regulation as exclusively a federal concern.'" *Pilot Life*, 481 U.S. at 46, 107 S.Ct. at 1552 (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68

L.Ed.2d 402 (1981)). In particular, "the phrase 'relate to' was given its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)).

Pugh does not oppose preemption by arguing the Separation Plan does not qualify as a plan, as is contemplated by ERISA.[7] Indeed, she cannot, for she alleges elsewhere in her complaint that Metlife violated the terms of ERISA in its administration of the Separation Plan.

Instead, Pugh counters with the rather astonishing theory that her allegations implicating DEL.CODE tit. 19, 1109(a) do not relate to the Separation Plan and are therefore not preempted by ERISA. This assertion can be disposed of without much further ado; given the "broad common-sense meaning" of "relate to," see *Metropolitan Life*, 471 U.S. at 739, 105 S.Ct. at 2389, Pugh can hardly be heard to argue her claim—which is rooted in an alleged failure of Metlife to obey the provisions of its Separation Plan—has no connection with an employee benefit plan.[8]

7. In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 3–4, 107 S.Ct. 2211, 2213–14, 96 L.Ed.2d 1 (1987), the Supreme Court held "a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing" was not preempted because the statute did not create a "plan" under ERISA. The Supreme Court reasoned the preemption provision had its genesis in the fear that a "patch-work scheme" of regulating the already complex administrative activities associated with maintaining employee benefit plans would encourage employers to refrain from adopting benefit plans. *Id.* at 11, 107 S.Ct. at 2217. This specter is only implicated, however, when there is a benefit plan in existence which requires administration; benefits *sans* plans do not involve administration. *Id.*

Expanding on *Fort Halifax*, the Third Circuit Court of Appeals held an employer-offered severance program which allowed an initial lump-sum payment of $75,000 and one year of continued benefits did not qualify as a "plan" under ERISA because the initial payment neither created an administrative scheme or imposed new require-

ments on a new administrative scheme. *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538–41 (3d Cir.1992).

8. The two cases Pugh cites to support her claim are distinguishable. First, in *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 117 (4th Cir.1989), the plaintiffs alleged their employer had breached a contract guaranteeing them employment until age 62. The plaintiffs brought various state law claims for breach of contract, promissory estoppel and negligent misrepresentation; the Pizlo court held the state law claims were not preempted because "[t]he claims do not bring into question whether Plaintiffs are eligible for plan benefits, but whether they were wrongfully terminated from employment after an alleged oral contract of employment for a term." *Id.* at 120. Here, of course, the whole question, or at least the lion's share of it, is whether Pugh was eligible for benefits under the Separation plan.

Second, in *Sandler v. New York News. Inc.*, 721 F.Supp. 506 (S.D.N.Y.1989), the court held ERISA preempted the plaintiff's contract claims, which sought to increase his amount of monthly

*See Turner v. Diamond Shamrock Chem. Co.*, 1987 WL 11441, at *1 (Del. May 27, 1987) ("Plaintiffs concede that ERISA 'supercede(s) [sic] all state laws relating to an employee benefit plan' and [Del.Code tit. 19, § 1109] insofar as it relates to severance pay.").

■ Pugh also argues the Court can exercise pendent jurisdiction over her state law claims even if they are preempted by ERISA. Nothing need be said regarding this novel theory, save that it confuses preemption with principles of subject matter jurisdiction: ERISA entirely *displaces* state law claims which relate to employee benefit plans.

pension benefits payable by alleging the amount he was actually owed under the Plan was contractually altered by his employer's representation. *Id.* at 512. Only the plaintiff's claim of negligent misrepresentation survived; the court emphasized he sued "not as a participant, seeking recovery of benefits from the Plan, but as an employee seeking economic damages from his employer alleged to arise from his relinquishment of his position at the paper." *Id.* Pugh, on the other hand, states quite clearly in the complaint she is suing as a participant of the Separation Plan; she has no claim of negligent misrepresentation. See D.I. 17 at ¶ 2.